1

```
 1              UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF TEXAS
 2                   MARSHALL DIVISION

 3
    MOBILE                 |  DOCKET NO. 2:13CV947
 4  TELECOMMUNICATIONS      |
    TECHNOLOGIES, LLC       |
 5                          |  JULY 22, 2015
                            |
 6  VS.                     |
                            |  9:00 A.M.
 7                          |
    LG ELECTRONICS          |
 8  MOBILECOMM U.S.A., INC. |  MARSHALL, TEXAS

 9  -----------------------------------------------------------

10         VOLUME 1 OF 1, PAGES 1 THROUGH 109

11        REPORTER'S TRANSCRIPT OF MOTION HEARING

12        BEFORE THE HONORABLE ROY S. PAYNE
              UNITED STATES MAGISTRATE JUDGE
13
    -----------------------------------------------------------
14

15  APPEARANCES:

16  FOR THE PLAINTIFF:     DERON DACUS
                           THE DACUS FIRM, PC
17                         821 ESE LOOP 323
                           SUITE 430
18                         TYLER, TEXAS 75701

19                         DUSTIN LEE TAYLOR
                           REED & SCARDINO
20                         301 CONGRESS AVENUE
                           SUITE 1250
21                         AUSTIN, TEXAS 78701

22

23  FOR THE DEFENDANT:     ALLEN GARDNER
                           POTTER MINTON
24                         110 NORTH COLLEGE AVENUE
                           SUITE 500
25                         TYLER, TEXAS 75702
```

1          KFIR LEVY
           JAMIE BEABER
2          WILLIAM JUSTIN BARROW
           MAYER BROWN
3          1999 K STREET, NW
           WASHINGTON, DC 20006-1101
4

5

6    COURT REPORTER:        TONYA JACKSON, RPR-CRR
                            FEDERAL OFFICIAL REPORTER
7                           300 WILLOW, SUITE 239
                            BEAUMONT, TEXAS  77701
8

9

10

11     PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
      TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>INDEX</u>

2                                                <u>PAGE</u>

3

4   MOTION TO DISQUALIFY                          6

5   EMERGENCY MOTION TO COMPEL DISCOVERY          49

6   MOTION TO AMEND DOCKET CONTROL ORDER          101

7   MOTION TO STRIKE                             104

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           (OPEN COURT, ALL PARTIES PRESENT.)

2           THE COURT:  For the record, we're here for the

3 motion hearing in *Mobile Telecommunications Technology*

4 *versus LG Electronics MobileComm*, which is Case

09:01AM 5 No. 2:13-947 on our docket.

6           Would counsel state their appearances for the

7 record.

8           MR. DACUS:  Good morning, your Honor.  Deron

9 Dacus here with Dustin Taylor on behalf of MTel, your

09:01AM 10 Honor; and we are ready to proceed.

11           THE COURT:  All right.  Thank you, Mr. Dacus.

12           MR. GARDNER:  Good morning, your Honor.  Allen

13 Gardner.  Here with me is Mr. Bill Barrow, Mr. Jamie

14 Beaber, and Mr. Kfir Levy; and we're here for the LGEMU

09:01AM 15 defendant.  And we're ready to proceed, sir.

16           THE COURT:  All right.  Thank you,

17 Mr. Gardner.

18           I guess before I start I should ask counsel if

19 they have worked out anything on the various motions that

09:01AM 20 we have before us.  Are there any agreements that should

21 be announced?

22           MR. GARDNER:  Your Honor, Allen Gardner for

23 Defendant LG.  Sir, concerning the request for *in camera*

24 inspection of documents, the parties have reached an

09:02AM 25 agreement that LGEMU would produce one copy of the

5

documents we requested that you review *in camera*. That document does not -- the fact that we are producing it to resolve this issue does not constitute in any way any waiver of any work product, attorney-client, or any other applicable privileges. They will only make one -- they will only keep that one copy of it, and they will treat it as source code.

THE COURT: All right. And, Mr. Gardner, just so I understand, this is in connection with the court's consideration of the Motion to Disqualify? Is that right?

MR. GARDNER: Yes, sir, but it specifically requests that -- our request that you, your Honor, review the documents *in camera*.

THE COURT: Okay. Well, I intend to take that motion up this morning. So, do you -- are you intending to share the documents with the other side? Is that my understanding of the agreement?

MR. GARDNER: Yes, sir. Yes, sir, we will momentarily.

THE COURT: Okay. And, Mr. Dacus, you're in agreement with that?

MR. DACUS: Yes, your Honor, we are in agreement with that. Obviously we have not seen the document, and I guess the only caveat is we might

09:03AM
reserve -- when the motion -- when the substantive motion comes up, we might reserve potentially to ask the court to file some sort of supplemental brief once we see the document itself.  But the agreement with respect to disclosure of the document that Mr. Gardner disclosed is in agreement.

THE COURT:  Okay.  I think what I'll do then is ask if the defendant will provide me with a copy of the documents and provide Mr. Dacus with a copy of the documents now.  We'll take a brief recess, and then we'll come back and argue the motion.

09:03AM

MR. GARDNER:  Yes, sir.

THE COURT:  Okay.  Anything else we need to put on the record before we --

09:04AM

MR. GARDNER:  No, sir.  As long as I give them to Mr. Chen.  I just want to make sure.

THE COURT:  That would be great.  Do that.

(Recess, 9:04 a.m. to 9:30 a.m.)

THE COURT:  All right.  I would like to start with the Motion to Disqualify and then move on to other motions.

09:30AM

So, I guess that's defendant's motion, if you want to speak to that.

MR. LEVY:  Thank you, your Honor.  Good morning.

09:31AM

1          THE COURT:  Good morning.

2          MR. LEVY:  The Motion to Disqualify is fairly

3  straightforward, we think.  Essentially what's happened

4  is there was an expert, Dr. Bims, who had been engaged

09:31AM  5  and worked for LGEMU, among other LG entities, in a

6  couple of ITC investigations.  Those investigations

7  involved some of the same products at issue here.  At

8  least one of them involved some of the same products at

9  issue here in this case and some of the same technology,

09:31AM  10  similar technology as well.  That case ended.  The

11  engagement agreement, you know, specifies, however, that

12  the confidential information should stay.

13          That expert was then subsequently hired by

14  MTel for this case and I believe for earlier cases as

09:31AM  15  well.  That all happened -- MTel's first engagement of

16  Dr. Bims happened -- you know, in our papers we say 19

17  months before we filed.  I'm trying to remember when they

18  were actually filed, but well over a year and a half ago.

19  It's probably getting close to two years now.

09:32AM  20          At some point -- at that point -- I mean, the

21  first thing you do when you hire an expert is you ask,

22  you know, "Have you ever done work for the opposing

23  party?"  I have a hard time imagining they didn't ask.

24  I'm certain they did.  And at that point it should have

09:32AM  25  been -- the first step they should have done after that

09:32AM

1 was, you know, "What sort of work did you do?  What kind

2 of technology?  Which products?"  Let's make sure -- if

3 we really want to hire this guy, let's make sure there

4 isn't a conflict.  Usually, frankly, when you hear that

5 the guy worked for the other side, you move on to the

6 next expert.  But let's say you really want this guy for

7 some reason.  You try to determine if there's a conflict.

8 I don't know whether that happened; but what I do know is

9 that just two weeks before the deadline for disclosures

10 of experts -- expert reports, we were notified -- under

11 the protective order, you have to give a certain amount

12 of notice "We're going to show our expert some

13 confidential information" -- we were notified that they

14 had engaged Dr. Bims for this case.

15          THE COURT:  Was that the first time you

16 learned of Dr. Bims' involvement in this case?

17          MR. LEVY:  Yes.

18          THE COURT:  Okay.  And I'm aware of the steps

19 you took thereafter.  Tell me what evidence you have in

20 the record that you shared confidential information with

21 Dr. Bims that's relevant to the issues in this case.

22          MR. LEVY:  So, the -- you know, it actually --

23 I'd like to lay a little foundation here to explain how

24 difficult it was to obtain some of this information.  The

25 cases that Dr. Bims worked on for LGEMU were ITC

1  investigations.  They're covered by protective orders.

2  The ITC protective orders are -- I don't want to use a

3  hyperbole here.  But they're incredibly strict, to the

4  point where, you know, even though LGEMU was a party to

09:34AM  5  the case, they can't access any of that information

6  today.  So, we worked with LGEMU and its prior counsel,

7  the Fish & Richardson law firm, to try to get some

8  information about what it is exactly that they did in

9  that case.  Unfortunately, they couldn't share all of it

09:34AM  10  with us; but there's plenty of information that's public.

11  We provided some of it to your Honor now to -- to MTel.

12          It's clear that a number of the same products

13  at issue here were at issue in that case.  The technology

14  at issue was --

09:34AM  15          THE COURT:  Tell me how that's clear.  What

16  I'm really looking for now from you is you just point out

17  to me the support in the record for these issues, and

18  then I can hear from the other side on those.

19          MR. LEVY:  Yes, your Honor.  So, one of the

09:34AM  20  products at issue in the prior case -- there were a

21  number of them, and we have them --

22          Bill, can you pull up one of the exhibits that

23  shows which products, where --

24          I know it's in our briefing, the LG products

09:35AM  25  that were at issue in the prior case.  They included as

09:35AM

an example the LG Optimus S. There were a number of
other products. The LG Optimus S is one of the products
at issue in this case. Not only is it at issue in this
case, but it is -- in Dr. Bims' second expert report, it
is the product that he analyzes. It's the one he goes
through.

In terms of the technology at issue, just from
MTel's own papers even -- there's not a dispute here --
it involves that the patents discuss transmitting
09:35AM information, how transmission to and from accused devices
operate. I think you'll see a little bit later today
there's a -- you know, in the discovery that's been
demanded in this case, they describe that same technology
for these same products.

09:36AM                 THE COURT: So, tell me where in the record is
the information about what the products were that were at
issue in the ITC proceedings.

MR. LEVY: Yes, your Honor. I think we're
trying to pull that up right now.

09:36AM                 THE COURT: Okay.

MR. LEVY: And I apologize. We didn't have a
whole lot of preparation on this.

THE COURT: And, I mean, if you -- you don't
have to physically show me if you can tell me; but if
09:36AM you're not sure, then I'll wait.

1          MR. LEVY:  Thank you, your Honor.

2          If I may consult with my counsel.

3          THE COURT:  Yes, of course.

4          MR. LEVY:  Which exhibit is it, Mr. Barrow?

09:36AM  5          MR. BARROW:  Exhibit N.

6          MR. LEVY:  Exhibit N.  It's the complaint from

7  the ITC investigation and it lists -- you know, these ITC

8  complaints are very long and they include lots of

9  information, including specific properties that are

09:36AM 10  accused, and you can see one of them is the Optimus S,

11  the US670.  We list a number of others.  It's in our

12  Exhibit N, which is the complaint from the 800

13  investigation, 337-TA-800.

14          THE COURT:  It's Exhibit N to Document 85,

09:37AM 15  which is your Motion to Disqualify.

16          MR. LEVY:  I believe it's Document 85, yes.

17          THE COURT:  And that would show the products

18  in it where?

19          MR. LEVY:  Page 25 of that exhibit.

09:37AM 20          THE COURT:  Okay.

21          MR. LEVY:  I'm reading the citation.  I don't

22  have that exhibit in front of me, your Honor.  My

23  apologies.

24          Some slow technology, your Honor.

09:38AM 25          THE COURT:  Okay.  I see that you have

12

1 highlighted on that page it looks like LG products

2 starting with Revolution and then Ally, Fathom, Optimus.

3             Which of those is at issue in this case?

4             MR. LEVY: Well, there are a number of them.

09:38AM 5 The one I pointed to is the one I have in my notes. But

6 it's in our briefing. We identify a number of them. But

7 a good example is the Optimus S. I believe that Optimus

8 C is also in this case.

9             THE COURT: Okay.

09:38AM 10             MR. LEVY: We'll grab that for you right now,

11 your Honor.

12             The LG Genesis, the Optimus C, the Optimus S,

13 and the Revolution.

14             THE COURT: And those were at issue in the ITC

09:39AM 15 proceeding and also in this proceeding?

16             MR. LEVY: They were at issue in the ITC

17 proceeding; and they are at issue in this proceeding,

18 your Honor.

19             THE COURT: And was that the first ITC

09:39AM 20 proceeding?

21             MR. LEVY: I think the 800 is the second.

22             THE COURT: So, in the ITC 800.

23             MR. LEVY: Yes, your Honor.

24             THE COURT: Okay. All right. And I saw the

09:39AM 25 documents that you just tendered for *in camera* review.

1 Those show meetings with counsel and similar events and

2 the amount of the billings.

3          MR. LEVY:  Yes, your Honor, as well as, you

4 know, the fact of shared attorney notes, the discussion

09:40AM  5 of non-infringement theories.

6          THE COURT:  Okay.  Tell me about the timing of

7 this agreement.  I saw in the briefing something about

8 when the agreement on the 800 matter, which is the second

9 of the two matters, expired.

09:40AM 10          MR. LEVY:  Yes, your Honor.

11          THE COURT:  What's your position on that?

12          MR. LEVY:  Yes.  Thank you.

13          So, there are two issues of timing in this

14 agreement.  The agreement covers, you know, the scope of

09:40AM 15 work and whatnot.  Where the parties disagree is with

16 respect to the confidential information; and this gets to

17 the first part of the general test in *Lake Cherokee Hard*

18 *Drive* and also in the *Koch* case, whether the opposing

19 party had a confidential relationship with the expert.

09:41AM 20          The agreement -- and we have one on the

21 screen -- says -- starts at the "Confidential

22 Information" section; and it says, "The obligation of

23 this clause shall survive the expiration or termination

24 of the agreement."  And the first part there that's

09:41AM 25 discussed is the confidentiality.  And that makes sense.

14

1  That survives expiration.  So, the confidentiality

2  provision, there is no termination; and, frankly, that

3  makes sense.  No one would suggest that Dr. Bims is free

4  to, you know, post online at this point what he's

09:41AM  5  learned, you know, from attorney notes and whatnot.  That

6  remains confidential just like it does for attorneys.

7           Mr. Barrow, if you could scroll down.

8           Right here, Subsections D and E, they include

9  limited term provisions; and they are -- the first is

09:41AM  10  that Dr. Bims agreed not to be opposed to LG in any

11  matter or in any matter in which LG might become a party

12  during the term of this agreement.  Now, this goes much

13  farther than, you know, *Lake Cherokee* or the *Koch* case.

14  This is you just can't be adverse to us just in any case

09:42AM  15  for anything, can't work as a consultant, you know.  That

16  only survives during the term of the agreement.  After

17  the agreement, the confidentiality still applies.

18           THE COURT:  So, tell me about the term of the

19  agreement.

09:42AM  20           MR. LEVY:  How long the agreement lasted, your

21  Honor?

22           THE COURT:  Right.  What were the dates that

23  comprised the term of this agreement?

24           MR. LEVY:  May I consult with --

09:42AM  25           THE COURT:  Yes.

1          MR. LEVY:  -- counsel?

2          Thank you.

3          Your Honor, my apologies.  We'll have to get

4     that information.  It gets a little bit difficult because

5     the case went up to the Federal Circuit and then came --

6     and because of that extra period of time, it went quite a

7     ways.  It's 2013-2014.  And we'll have to -- I'm happy to

8     provide that date for you today.

9          THE COURT:  As I recall, there was something

10    that I saw in the briefs at least about alternate dates.

11    I don't remember whether it was the earlier or the later

12    of, but a variety of different things.  Does that relate

13    to this agreement?

14         MR. LEVY:  Alternate dates?  I'm not sure,

15    your Honor.  I think -- my understanding is that the

16    dispute over the term of the agreement is really over

17    whether the expiration of the agreement applies to the

18    entire confidentiality provision or just to those two

19    later portions of that section.  We can provide the -- I

20    can get you today the final date when this engagement

21    would have ended.

22         THE COURT:  Okay.  Well, we're going to take

23    it up now -- let me see -- but I'm trying to find the

24    part of the brief that dealt with that.

25         Okay.  This is -- I'm looking at MTel's

1 opposition.  On page 4 of their opposition, they say
2 (reading) the agreement was signed February 2, 2012.
3 Paragraph 2 of the agreement states that it expires no
4 later than either 2 years from the effective date, 1 year
09:44AM 5 from the completion of any work performed, or 1 year from
6 the completion of the *InterDigital* litigation.
7 MR. LEVY:  Yes, your Honor.
8 THE COURT:  So, that's what I'm trying to
9 figure out, what is -- which of those dates is the
09:44AM 10 applicable one.
11 MR. LEVY:  What I'm struggling with here, your
12 Honor, is that the case went on for some time because it
13 went up to the Federal Circuit and I just don't have that
14 date and I'm not sure if the two years eclipses that or
09:45AM 15 not.
16 THE COURT:  Well, MTel represents in their
17 brief that the *InterDigital* litigation concluded on
18 February 12th, 2014, as you can see there.  Do you agree
19 or disagree with that?
09:45AM 20 MR. LEVY:  At the ITC it did.
21 THE COURT:  Okay.  So, that's the date it
22 ended at the ITC.  Okay.
23 MR. LEVY:  That's right, your Honor.  And I
24 just want to stress that regardless of when the agreement
09:45AM 25 ended, that the -- the engagement on that particular case

1  ended, the confidentiality still stayed.

2         THE COURT:  I understand that.  I'm trying to

3  get a better understanding of what Dr. Bims'

4  understanding of his arrangement with LG would be,

09:46AM  5  which -- before I talk to MTel about it, but --

6         MR. LEVY:  Yes, your Honor.  And I would

7  submit that Dr. Bims' understanding may be helpful, but

8  that what's controlling here is what MTel's understanding

9  of the law should be.  And just speaking as a

09:46AM  10  practitioner who deals with this sort of issue on a

11  regular basis, when you engage an expert, the first thing

12  you do is you find out if that expert has worked for the

13  opposing party before; and if so, you know, oftentimes

14  you just move on to the next expert.  If you still really

09:46AM  15  want that expert for some particular reason, you dig a

16  little deeper.  And if you find out that it covered the

17  same technology or the same products, then you really do

18  have to move on.  I mean, at some point you're just --

19  you're conflicted.  And that's from the counsel side of

09:46AM  20  things.

21         I've certainly been on conversations where the

22  expert says, "You know, I think I can do this"; and I

23  know from my side, sitting -- from my side of the desk,

24  you know, I appreciate what the law is and I say, "I'm

09:47AM  25  glad you're able to do that and you believe you're able

1  to do that, but that's just not permitted here from my

2  side."  We don't want to end up in the very situation

3  that MTel finds itself in here, facing a Motion to

4  Disqualify because I hired an expert that has a conflict.

09:47AM  5  THE COURT:  Right.  Do you have any evidence

6  that Dr. Bims performed work after the latest invoice

7  that you submitted, which is July 10 of 2012?

8  MR. LEVY:  No, your Honor.  We don't have

9  evidence of additional work after that for LGEMU on these

09:47AM  10  two cases.

11  THE COURT:  Okay.  Thank you.

12  And I've read your briefs on it and I'll give

13  you a chance to respond, but I'd like to hear from MTel

14  now.

09:48AM  15  MR. LEVY:  Thank you, your Honor.

16  THE COURT:  Thank you, Mr. Levy.

17  MR. TAYLOR:  Good morning, your Honor.

18  THE COURT:  Good morning, Mr. Taylor.

19  MR. TAYLOR:  Now, I would like to first

09:48AM  20  address two examples of possible waiver by LG that would

21  render this issue moot.  First, when LG first objected to

22  Dr. Bims, they did so under the protective order.  Their

23  protective order gave them ten days to file an official

24  motion seeking to preclude Dr. Bims' ability to view

09:48AM  25  confidential information.  Those ten days came and went,

09:49AM

1  with the only exception during that time period being

2  Dr. Bims' inability to view confidential information in

3  time to submit his expert report.  LG never filed that

4  motion, instead filing the present Motion to Disqualify

5  him.

6           Second, if you look at the terms of the

7  agreement, specifically the paragraph -- I believe it's

8  8.  My eyes are, sadly, not able to see it from here.

9  But specifically the provision that they claim is

09:49AM

10  indefinite regarding confidentiality.  A provision of

11  that paragraph also says that they are not -- or the very

12  existence of disagreement is confidential.  By producing

13  this document not under the privilege order, not for the

14  *in camera* review like the other documents which are

09:49AM

15  subject to our other agreement, but by producing the

16  document in the open, LG destroyed that provision.

17           Now --

18           THE COURT:  I don't think either of those

19  constitute a waiver of their Motion to Disqualify.  I --

09:50AM

20  what I guess I'd like to hear first is:  Do you have any

21  argument against the position that Dr. Bims did undertake

22  an arrangement with LG that justified them in believing

23  that they would keep information they gave him

24  confidential?

09:50AM

25           MR. TAYLOR:  Yes, your Honor.

1          THE COURT:  Tell me about that.

2          MR. TAYLOR:  Yes, your Honor.  First is the

3 agreement itself.  And this is exactly what your Honor

4 was referencing a few minutes ago with opposing counsel

09:50AM  5 in that the 800 agreement has an expiration date and

6 MTel's engagement of Dr. Bims occurred outside of that

7 expiration date.

8          THE COURT:  Okay.  No, I'm back on -- actually

9 what I'm asking about is what is described in the *Koch*

09:51AM 10 case in the Fifth Circuit about the first step of that

11 test, that LG has to show that it was objectively

12 reasonable for them to conclude that a confidential

13 relationship existed.  And that's at some point, not

14 necessarily at the time you retained him.

09:51AM 15          MR. TAYLOR:  Understood, your Honor.  And

16 MTel's issue with the two factors actually goes to the

17 second factor, which is the relevancy of the documents.

18          THE COURT:  I assumed that, but I just wanted

19 to get that expressed.

09:51AM 20          Okay.  So, tell me about your position on the

21 second factor.  Why is the information that was disclosed

22 to Dr. Bims not relevant to this proceeding?

23          MR. TAYLOR:  Yes, your Honor.  As your Honor

24 knows, the mere disclosure of any confidential or

09:51AM 25 privileged information is not adequate to disqualify an

1 expert from adverse representation in the future.

2 Instead, the disclosed information must be relevant to

3 the case.

4          Taking the matters that were, up until this

09:52AM  5 morning, for *in camera* review -- I believe, your Honor,

6 I'm missing the remote.

7          MR. LEVY:  Your Honor, may I confer with

8 counsel for just a moment regarding disclosure of this --

9 putting this information up on the screen?

09:52AM 10          THE COURT:  Yes.  All right.

11          MR. LEVY:  Your Honor, my misunderstanding.

12 Sorry.  We were putting stuff up on the board, and I just

13 wanted to make sure we weren't --

14          THE COURT:  That's Mr. Walter.  He's with me.

09:53AM 15          MR. LEVY:  My apologies.  Congratulations on

16 the position.

17          MR. TAYLOR:  That was my next step.  All

18 right.

19          MR. LEVY:  My apologies, your Honor.

09:53AM 20          THE COURT:  He will be with Chief Judge Prost.

21 So, maybe he'll have a chance to look at this again.

22          MR. TAYLOR:  As your Honor can see, the first

23 line is specifically discussing the 3GPP standards.  Your

24 Honor, mobile phones -- even to the extent that there are

09:53AM 25 accused devices in the ITC investigation that are also

1  accused in this case, mobile phones are capable of

2  numerous upon numerous functions and activities.  You can

3  play games on them; you can make calls on them.

4           THE COURT:  Well, what is Dr. Bims' area of

09:53AM  5  expertise?

6           MR. TAYLOR:  Mobile telecommunications.

7           THE COURT:  All of it?

8           MR. TAYLOR:  He has had experience in almost

9  every minute factor of it.  Yes, your Honor.

09:54AM  10          THE COURT:  Well, I'm -- it's the same

11  products at issue in this case as were in the ITC case

12  where he was retained by LG; is that right?

13          MR. TAYLOR:  Yes, your Honor.

14          THE COURT:  So, what can you tell me about the

09:54AM  15  difference in the issues between the two proceedings?

16          MR. TAYLOR:  Yes, your Honor.  And I believe

17  one of the cases actually cited by LG speaks directly to

18  this issue; and that's the *Nike* case, 2006 U.S. District

19  LEXIS 97109.  And in that case the courts did not

09:54AM  20  specifically look to the broad similarity between the two

21  issues but, rather, they looked at the claims.  And this

22  is covered to extent in MTel's briefing on this issue.

23  But the claims between the patents at issue and the

24  patents at issue in the ITC investigation are not

09:55AM  25  overlapping.

1    And in that *Nike* case, the court did not

2  disqualify the same expert from opining regarding the

3  defendant's infringement of another patent regarding the

4  same technology.  So, what we really need to do is look

09:55AM  5  at the similarity between the claims on this issue.

6    THE COURT:  I do not necessarily agree with

7  that analysis, and I -- I'm really not concerned about

8  what another district court has done in a different case.

9  What I want to know is:  What can you tell me about how

09:55AM  10  different the issues are that Dr. Bims consulted on

11  before and has before him now?

12    MR. TAYLOR:  Yes, your Honor.  As your Honor

13  can understand, unfortunately, our awareness of exactly

14  what Dr. Bims did in the ITC investigation is somewhat

09:55AM  15  limited.  We are given only the information that we have

16  before us today, meaning the documents right here that

17  discuss the review of the 3GPP standards and the

18  documents that we were able to pull off the ITC website.

19    Now, Dr. Bims' work in the ITC investigation

09:56AM  20  focused primarily on the 3GPP standards of transmitting

21  and receiving radio frequency signals between the device.

22  Here, especially in the '946 case, Dr. Bims' work has

23  focused on more of an application layer, to the extent

24  that the e-mail application -- and Dr. Bims' work on this

09:56AM  25  is in the infringement mind-set.  So, Dr. Bims has

1 examined whether the e-mail application receives an

2 entire message, whether it requests a portion of the same

3 message; and it's focusing on those applications.

4         Similarly, for the '428 patent we have been

09:56AM 5 looking at the Google Cloud Messenger application. And

6 for the '506 patent we have been looking at the calendar

7 and messaging applications. So, similar to how a child

8 can play the War of the Clans application game on a

9 phone, these are applications that are running and unique

09:57AM 10 to the specific software. Dr. Bims' work in this issue,

11 in this case, has dealt primarily with the applications,

12 whereas his previous work in the ITC investigation dealt

13 with the compliance with the 3GPP transmission standards.

14         THE COURT: Well, when MTel retained Dr. Bims

09:57AM 15 in connection with this case against LG, did Dr. Bims

16 make MTel aware of his prior consulting work for LG?

17         MR. TAYLOR: Yes, your Honor. Dr. Bims stated

18 that he had worked with LG in the past. As referenced

19 earlier, the terms of the agreement explicitly forbade

09:58AM 20 Dr. Bims from discussing in detail or even revealing the

21 existence of the agreement itself. However, we were

22 able, through public information, to investigate the ITC

23 prior matters and to determine that there was not

24 relevancy to the claims at issue.

09:58AM 25         THE COURT: And what is your position on when

1 Dr. Bims' consulting agreement with LG terminated?

2          MR. TAYLOR:  Our opinion is that the agreement

3 expired no later than February 12th, 2015.  MTel

4 disclosed Dr. Bims on March 30th, 2015.

09:58AM  5          THE COURT:  And when did you retain Dr. Bims?

6          MR. TAYLOR:  Shortly before we disclosed him.

7          As your Honor may remember, in the previous

8 litigations in this case -- and specifically the *Apple*

9 and *Samsung* litigations -- MTel had used a Dr. Nettleton.

09:59AM 10 MTel had been in negotiations with Dr. Nettleton for his

11 retention in this case and ultimately decided not to

12 pursue that avenue.  And Dr. Bims' familiarity with the

13 patents -- or at least some of the patents from the

14 *Amazon* case where he had provided an opinion, although

09:59AM 15 not testified in court, made him the next obvious choice.

16 After we cleared the ITC investigation issue, we

17 disclosed him to LG.

18          THE COURT:  So, tell me when you first made

19 contact with Dr. Bims about the LG case.

09:59AM 20          MR. TAYLOR:  Your Honor, speaking from memory,

21 I would -- it was prior to the February 12th, 2015, issue

22 wherein Dr. Bims told us that he had worked with LG in

23 the past.  At that point we continued our negotiations

24 with Dr. Nettleton.  When Dr. Nettleton --

10:00AM 25          THE COURT:  Give me a date.  And you can give

1 me your best recollection of the date, but just saying

2 that it's prior to something doesn't really help.

3          MR. TAYLOR:  Yes, your Honor.  I would say the

4 initial contact whereupon Dr. Bims informed us of his

10:00AM  5 potential conflict with LG occurred in January, 2015.

6 The subsequent communications wherein we asked Dr. Bims

7 to consult for us in this case occurred in early March,

8 2015, from my best recollection.

9          THE COURT:  And has MTel retained Dr. Bims in

10:01AM  10 the past on other cases?

11          MR. TAYLOR:  Yes, your Honor, on the *Amazon*

12 case.

13          THE COURT:  Okay.  And what was the time frame

14 of that retention?

10:01AM  15          MR. TAYLOR:  Honestly, your Honor, I -- and

16 excuse me.  Allow me to clarify.  Do you mean the date we

17 first made contact?

18          THE COURT:  Well, just -- I mean, that work

19 was done during -- what -- 2013 and 2014 or what --

10:01AM  20          MR. TAYLOR:  Yes, your Honor.

21          THE COURT:  Okay.  All right.  Go ahead and --

22 if you have anything further to say that will help me

23 understand your position on the relevancy or lack

24 thereof, maybe what I can do is let LG address that issue

10:02AM  25 and then give you a chance to respond.  That might be the

1 more productive way.

2          MR. TAYLOR:  Thank you, your Honor.

3          THE COURT:  Thank you, Mr. Taylor.

4          MR. LEVY:  Thank you, your Honor.

10:02AM   5          With respect to the dates, I'd just like to

6 clarify a couple of things, if I could.  The first

7 contact -- the first engagement, I believe, was

8 September, 2013; and that was in the *Clearwire* case.  For

9 MTel, that was the first time they engaged Dr. Bims.  I

10:03AM  10 believe there was some confusion about which date.  He

11 was also used in the *Amazon* case but initially in the

12 *Clearwire* case.

13          I would also say, with regards to what

14 Dr. Bims would have thought and what his understanding

10:03AM  15 was, you know, they have access to Dr. Bims.  Frankly, if

16 I was on the other side of this motion, I would have

17 attached a declaration explaining Dr. Bims' position,

18 Dr. Bims' declaration, this is why these are different.

19          We can't get all that deeply into the work he

10:03AM  20 did in the prior cases because it's sealed.  We're able

21 to --

22          THE COURT:  I don't need you to get into the

23 work, but you certainly know what the ITC proceeding was

24 about.

10:03AM  25          MR. LEVY:  It covered a variety of technology.

1   There were two proceedings.  There was the 3G technology

2   at issue there, how the transmissions to and from the

3   accused devices operate.  That was certainly one aspect

4   of the 800 investigation.  MTel agrees.  That's how they

10:04AM   5   describe it, frankly.  The 3G technology regarding

6   transmission to and from the accused devices, that's

7   present in the current devices.  You know, I think what

8   you'll see a little bit later -- maybe we can put it up.

9         It's going to come up in the Motion to Compel

10:04AM   10   argument that's going to come up later today.  But one of

11   the sets of documents that they have asked us for are

12   documents related to the technical operations of LG's

13   products.

14         Actually if we could put up the actual letter,

10:04AM   15   the categories of information.

16         They describe the categories of information

17   they want; and this is what we're talking about,

18   transmissions to and from the accused devices and the

19   network.  I mean, our best understanding is that there is

10:05AM   20   a considerable amount of overlap here and -- not just in

21   the type of technology but in the products themselves.

22   Not to mention that Dr. Bims would have sat in the

23   room -- the -- you know, the *in camera* review documents

24   that have been disclosed today, you know, they talk

10:05AM   25   about, you know, calls with, for example, Linda Kordziel,

1  an excellent attorney at Fish & Richardson, discussing

2  their attorney notes and non-infringement theories from

3  the case.  These would have dealt with the products in

4  those cases.  The products in those cases are -- at least

10:05AM  5  overlap with products in these cases.  There would have

6  been discussion of how these devices operate, how they

7  operate on the network.

8              Is this the letter?

9              So, for example, they -- one of the types

10:05AM  10  of -- one of the informations they asked for was, you

11  know, relevant servers, communications between the

12  servers and the --

13              Scroll down just a little bit, if you could.

14  Right there.

10:06AM  15              (Reading) protocol documents, state-flow

16  diagrams, and/or flowcharts showing the communication

17  between the two devices and the relevant server.  They're

18  talking about transmissions to and from the network and

19  the accused device.

10:06AM  20              Which device are they talking about?  Well, in

21  Dr. Bims' infringement report in this case, he's talking

22  about the LG Optimus S.  What was he talking about in the

23  800 investigation?  Well, among other devices, the

24  Optimus S, also the Optimus C.  I'm drawing a blank right

10:06AM  25  now on the products.

1          The next category of documents, again,

2     (reading) protocol documents, state-flow diagrams,

3     flowcharts showing the communication between an accused

4     device and the relevant server when.  And again these are

10:06AM  5     communications between these devices.  This is what they

6     have been asking us for.

7          You know, we'll discuss that in the Motion to

8     Compel; but this is the information they're saying that

9     they don't have and they need in this case.  This is the

10:06AM 10     basis for them wanting to, you know, put in additional

11     expert reports from Dr. Bims.  We're talking about the

12     same information, same kind of technology for the same

13     products.  Again, you know, if Dr. Bims had a different

14     understanding and I was on the other side of this motion,

10:07AM 15     I would put in a declaration.  I would ask:  Where is the

16     declaration?

17          THE COURT:  All right.

18          MR. LEVY:  Are there any other questions, your

19     Honor?

10:07AM 20          THE COURT:  I'm looking at the ITC proceeding,

21     at least the third amended complaint in the 800

22     proceeding which is attached to your motion; and I am

23     wondering if that document does not have something in it

24     that would show what the scope of the issues were in that

10:08AM 25     case.

1     MR. LEVY:  Your Honor, we'll try to pull that

2  up right now.

3     I would also add, your Honor, just given the

4  timing, apparently the first contact, we understand now,

10:08AM  5  was while Dr. Bims was still under the agreement.  So,

6  the first discussion -- excuse me -- about this case

7  between MTel and Dr. Bims would have been while all

8  parties agree he was still under contract to LG.  The

9  agreement hadn't expired.  So, even setting aside the law

10:08AM  10  on disqualification, there's also that -- I hate to call

11  it "impropriety."  But at the very least at that point,

12  you know, make the disclosure so let's get this issue

13  resolved.  Because from our side we'd like to get this

14  handled -- we would have liked to have gotten this

10:08AM  15  handled before expert reports were due; and I'm sure from

16  their side, if they would have needed to find another

17  expert, they would have wanted as much time as possible

18  with that.

19     THE COURT:  While you're doing that...

10:09AM  20     (Discussion off the record between the court

21  and the law clerk.)

22     MR. LEVY:  Your Honor, if I may.

23     THE COURT:  Yes, you may.

24     MR. LEVY:  We've pulled up the ITC

10:10AM  25  investigation complaint and gotten to the technology and

1  products at issue.  I'll just read the highlighted

2  section.  This is on -- which exhibit is this?  We'll get

3  you the exhibit number.  I don't want to have to scroll

4  all the way back up.

10:10AM  5            THE COURT:  I think this is Exhibit N --

6            MR. LEVY:  Yes, that's right, your Honor.

7  Thank you.

8            THE COURT:  -- to your motion.

9            MR. LEVY:  Paragraphs 4.1 and 4.2.  The

10:10AM  10  devices -- you know, they're talking about the products

11  and technology at issue.  "These devices allow users to

12  place and receive telephone calls and/or to run data

13  applications, such as web browsing, email, and audio and

14  video streaming."  Well, what are they talking about?

10:10AM  15            These wireless devices at issue operate as,

16  for example, cellular mobile telephones, they allow

17  streaming, communication, third-generation or 3G cellular

18  systems.  These are the products that are at issue in

19  this case.

10:11AM  20            Some of the products at issue in this case are

21  LTE, or fourth-generation products; but certainly there

22  are plenty of 3G products also at issue in this case.  I

23  would also note that all the 4G, or LTE, products are

24  also 3G compatible.  They work on the same networks.

10:11AM  25  It's the same issue.  It's the -- it's transmissions to

1 and from.

2　　　　　I'm sure this court will recall the -- you

3 know, the hour and plus we spent discussing what exactly

4 is transmitted and retransmitted during the *Markman*

10:11AM 5 hearing.  And both -- as my co-counsel has just reminded

6 me, both browsing and e-mail were at issue in that case.

7 Both browsing and e-mail are accused in this case.

8　　　　　THE COURT:  All right.  Do you have any other

9 argument you want to offer on the relevance issue?

10:12AM 10　　　　　MR. LEVY:  No, your Honor.

11　　　　　THE COURT:  Okay.  Thank you, Mr. Levy.

12　　　　　MR. TAYLOR:  Thank you, your Honor.

13　　　　　The patents at issue in the 758

14 investigation -- and this is reading from MTel's

10:12AM 15 opposition on page 8.  The patents at issue in that

16 investigation include the '092 patent which pertains to

17 the recording of audio, the '604 patent which pertains to

18 associating an image of an individual with that

19 individual's contact information, the '464 and '447

10:12AM 20 patents which pertain to handoffs between networks --

21 excuse me -- which pertain to processing image data, the

22 '205 patent which pertains to handoff between networks,

23 and the '732 and '611 patents which globally apply to

24 transmitting information.

10:13AM 25　　　　　Likewise, the patents in the 800 investigation

1  pertain to the 3G -- specifically the 3G technology

2  underlying how transmissions to and from the accused

3  devices operate.

4          THE COURT:  You know, I've got a copy of the

10:13AM  5  '205 patent that was at issue in the 758 proceeding and

6  it has some terms in it that appear remarkably similar to

7  the ones that are at issue in the MTel cases that we have

8  been working on.  And in the abstract it talks about soft

9  handoff and hard handoff.  It talks about the

10:13AM  10  communication from the first base station and the second

11  base station, and I -- it certainly looks related to what

12  we have been dealing with in these cases.

13          MR. TAYLOR:  Yes, your Honor.  I would

14  specify, however, that those patents at issue and the

10:14AM  15  issues dealing with handover and the first transmission

16  and second transmissions pertain to patents that are not

17  at issue in this case.  Specifically those -- your Honor

18  may be remembering from the *Apple* trial those dealt with

19  the '403 patent, the '210 patent, and '891 patent, none

10:14AM  20  of which are at issue in this case, none of which

21  Dr. Bims has been asked to opine regarding how LG may or

22  may not infringe those patents.

23          THE COURT:  The arguments about soft handoff

24  and hard handoff, those are not at issue in this case?

10:15AM  25          MR. TAYLOR:  No, your Honor.

1      THE COURT:  Which current case are those at

2  issue?

3      MR. TAYLOR:  That may be, your Honor,

4  AT&T/Leap, previously Clearwire, previously Apple.

10:15AM  5      THE COURT:  All right.

6      MR. TAYLOR:  As a point of reference, your

7  Honor, internally -- and I believe externally as well --

8  it has been referred to as the "transmission patents";

9  and those patents are not at issue in this case.

10:15AM  10  Instead, at issue in this case are what we call the

11  "messaging patents."  And as I had mentioned earlier,

12  those pertain to the specific applications accused

13  operating on the LG devices.

14      THE COURT:  Tell me why you need Dr. Bims as

10:16AM  15  opposed to some other expert who has not been under

16  contract with LG on these products.

17      MR. TAYLOR:  Yes, your Honor.  At the time

18  disclosure came up, Dr. Bims' familiarity with the

19  patents from the *Amazon* case placed him in a very small

10:16AM  20  pool of potential candidates that could come up to speed

21  quickly on the issues and that were familiar with the

22  underlying technologies.  In addition, Dr. Bims himself,

23  his academic record, his experience, his -- what I would

24  simply call "litigation strategy."  Dr. Bims' ability to

10:16AM  25  withstand cross-examination on the stand, Dr. Bims'

1 unique attributes that are unique to him as an

2 individual, in combination with his familiarities with

3 our patents, and his experience in the industry over the

4 past decades made him the viable choice at that time.

10:17AM 5          THE COURT:  I'm just really concerned,

6 Mr. Taylor, with the fact that he has this prior

7 relationship.  I -- you know, the documents that were

8 submitted *in camera* show that he billed in excess of

9 $30,000 to LG on these proceedings.  So, it wasn't just

10:17AM 10 that they were trying to conflict him out.  He was doing

11 real work for them on the same products that are at issue

12 in this case.  He met with their lawyers.  He had access

13 to their strategy about these products.  And I have not

14 heard any clear dividing line between what was at issue

10:18AM 15 in the ITC case and what is at issue here.  I understand

16 there are differences, naturally; but I'm -- I just have

17 a lot of concern about allowing an expert to, in effect,

18 switch sides like that.

19          MR. TAYLOR:  Your Honor, Dr. Bims never

10:18AM 20 represented LG in its case against MTel.  So --

21          THE COURT:  Not in this case.  That's right.

22          MR. TAYLOR:  I was just struck by your Honor's

23 inclusion of the words "switching sides," which has a

24 clear meaning in the case law on this issue.

10:18AM 25          THE COURT:  I'm aware of it.

10:19AM

MR. TAYLOR:  And, your Honor, I believe that the policy considerations that the courts have examined in these cases fall in favor of denying LG's request for disqualification.  Most specifically is -- are two. First, that LG and MTel are not direct competitors. Dr. Bims is an independent consultant.  Dr. Bims is not working on a product or service that is going to be competitive to LG's.  He signed agreements preventing the disclosure of the confidential information that he will receive, and he's not being asked to opine regarding any functionality that's at issue in both this case and the previous engagements.

THE COURT:  How do we know that -- well, how do you know that?

10:19AM

MR. TAYLOR:  We know that by looking at the information that is available to us.

THE COURT:  And what information is that?

MR. TAYLOR:  The ITC complaint, the patents at issue in the ITC case, and the documents cited in MTel's opposition that discuss the scope of the patents and technology in the ITC case.

10:20AM

THE COURT:  Okay.  So, point me to the evidence in the record by which we know what you just said, that they're not related.

10:20AM

MR. TAYLOR:  Yes, your Honor.  Exhibit O to

1  MTel's opposition and Exhibit N to MTel's -- excuse me.

2  I believe these are actually Exhibits O and N to LG's

3  motion, which are also cited in MTel's opposition; and

4  these are specifically the complaint that discuss the --

10:20AM  5  and identify the patents at issue.  I'm reading from

6  MTel's opposition on page 8.

7            That, when contrasted with Exhibits F, as in

8  Frank, through H, as in Harry, to MTel's opposition,

9  which are MTel's 3-1 claim charts that show the

10:21AM  10  functionality at issue in this case, show a clear divide.

11            THE COURT:  Okay.  Show me the clear divide.

12            MR. TAYLOR:  The '092 patent, as I mentioned

13  earlier, discusses the recording of audio.  MTel's 3-1

14  claim charts show specifically accusing the messaging

10:21AM  15  application for the '506 patent, the GCM application for

16  the '428 patent, and the e-mail application, specifically

17  the ability -- the very discrete functionality, not just

18  all e-mail, not the ability to compose an e-mail and send

19  it from your device, but the ability to receive an e-mail

10:21AM  20  that contains an attachment and specify the desire to

21  receive that attachment.

22            None of the patents listed in Exhibits O and N

23  to LG's motion contain any functionality that is

24  overlapping with that.  Although at a high level there

10:22AM  25  may be overlap between those patents and other MTel

1  patents and at a high level the devices which are capable

2  of numerous features are -- may be the same, the

3  functionality -- the specific functionality accused in

4  this case was not at issue in the ITC investigation.

10:22AM  5  And, your Honor, this is information that we are able to

6  access.  LG is coming to us and saying that there is a

7  burden, that there is a similarity; but we have seen no

8  evidence apart from a high-level accusation that both of

9  the devices are the same -- some of the devices are the

10:22AM  10  same in both cases, that there is any similarity.  The

11  information that we are able to view, the information

12  that we are able to obtain does not meet any burden of

13  proving any similarity.

14           THE COURT:  Well, they certainly meet

10:23AM  15  similarity on one basis; and that is they're the same

16  devices.  And I'm not sure that that's not enough.  I

17  think that when an expert has consulted regarding those

18  devices for the manufacture of them, for him to go and --

19  I mean, I'm surprised that he was willing to undertake

10:23AM  20  this.  How can he know how this case is going to develop

21  in terms of what is going to end up being accused?

22           MR. TAYLOR:  At the time of Dr. Bims'

23  inclusion in the case, shortly before his expert reports

24  were due, the deadline for identifying what was accused

10:24AM  25  and how those products operated was a few weeks away.

1          THE COURT:  Talk to me about why there isn't

2     anything in the record from Dr. Bims saying, "Hey, this

3     is completely different than what I did before."

4          MR. TAYLOR:  That there was never a conscious

10:24AM  5     decision to omit any such information.  I cannot say with

6     any certainty as to why that information is not present

7     other than that it was never mentioned as something to

8     include.  The scope of the claims -- looking at the case

9     law on the issue that examined the similarity between the

10:25AM  10    claims that the patents -- and the two issues --

11          THE COURT:  You talking about just the *Nike*

12    case?

13          MR. TAYLOR:  Yes, your Honor.  There was --

14    also the *Power Mosfet Tech, LLC*, 2000 Westlaw 35727080,

10:25AM  15    which held that no confidential relationship existed when

16    the expert was never an employee of the party or informed

17    that consulting with the party would limit his future

18    employment.

19          THE COURT:  Okay.  Well, that clearly does not

10:25AM  20    apply here.  There clearly was a confidential

21    relationship.  He signed an agreement promising to keep

22    the information confidential, right?

23          MR. TAYLOR:  Yes, your Honor.  And that

24    agreement, to the extent that it prevented him from ever

10:25AM  25    being adverse to LG, also had a termination provision.

1      Your Honor, LGEMU markets and manufactures --

2  excuse me -- markets -- LGEMU markets mobile devices.

3  Allowing LG to interpret the confidentiality provision to

4  prevent anyone that ever works for them from ever having

10:26AM  5  anything to do with mobile devices extends the adverse

6  representation clause indefinitely.  The only thing LGEMU

7  does is --

8      THE COURT:  And I'm not --

9      MR. TAYLOR:  -- market phones.

10:26AM  10      THE COURT:  I'm certainly not agreeing that

11  this is a disqualification that will last for the rest of

12  Dr. Bims' career.  However, I also know that the life of

13  these products is limited.  They're going to roll out new

14  products.  But here we're talking about the same

10:26AM  15  products, aren't we?

16      MR. TAYLOR:  Some of them, yes, your Honor.

17      THE COURT:  Yeah.  And I think that is a

18  limiting thing in itself.  The fact that his involvement

19  with MTel basically overlapped with at least the end of

10:27AM  20  his contract with LG shows that we're not talking about

21  something perpetual here.  We're just talking about this

22  case.

23      MR. TAYLOR:  A point of clarification on

24  something your Honor just mentioned.

10:27AM  25      THE COURT:  Yes.

1          MR. TAYLOR:  The -- earlier LG made reference

2    to a first engagement of Dr. Bims in *Clearwire*.  My

3    earlier comment about MTel's first reach-out ever of

4    communication with Dr. Bims occurring in January was

10:27AM  5    specific to this case.

6          THE COURT:  I understood that.

7          MR. TAYLOR:  Thank you, your Honor.

8          And in that first communication, Dr. Bims

9    simply said, "I've previously worked for LG."

10:28AM 10    Additional -- any work that Dr. Bims did did not occur

11    until after LG's engagement with Dr. Bims had terminated.

12    There is no overlap.

13          THE COURT:  Well, the -- I mean, I don't think

14    that, frankly, whether the contract had terminated or not

10:28AM 15    is the real issue; but, to me, the fact that the dates

16    are so close counts heavily in LG's favor.  And that plus

17    the fact that it's the same devices at issue and that he

18    had the kind of role he did where he met with counsel and

19    was a part of their strategy sessions, I think that's a

10:29AM 20    compelling case.

21          MR. TAYLOR:  I understand your Honor's

22    statement.  I would simply urge consideration of the

23    position that Dr. Bims' meetings with counsel, as

24    evidenced by the documents we've seen today, discussed

10:29AM 25    the non-infringement and invalidity of specific patents

1  and the claims and the scope of those patents.

2  THE COURT:  But it's the non-infringement by

3  the same products.

4  MR. TAYLOR:  Yes, your Honor.

10:29AM  5  THE COURT:  So, he would have gathered

6  information from LG about their views of how their

7  products operate and what their

8  infringement/non-infringement arguments would be.

9  MR. TAYLOR:  Your Honor, the non-infringement

10:30AM  10  and operation is specific to the discrete functionality.

11  I've made reference several times to the numerous

12  functions that a device can do, a -- how a device can

13  transmit at a hardware level or with -- compliance with a

14  specific 3GPP standard that's not at issue in this case

10:30AM  15  would not raise the same issues of operation or

16  non-infringement than would be raised at the application

17  layer.

18  THE COURT:  Well, I can tell you I guess the

19  way I'm analyzing this -- and I'll say it for the record

10:30AM  20  so that you can pursue it if you need to -- but I think

21  that once they have established that that confidential

22  relationship existed regarding the same devices, I think

23  that effectively that shifts the burden to your side to

24  show that despite that, it's not related; and I haven't

10:31AM  25  heard anything that is convincing in that regard.

<table>
<tr><td></td><td>1</td><td>Tell me what would be the effect now on your</td></tr>
</table>

1       Tell me what would be the effect now on your

2   case if Dr. Bims is disqualified.

3           MR. TAYLOR:  The effect, in my unseasoned

4   opinion, would be catastrophic, that with trial set for

10:32AM  5   mid September, the removal of an expert regarding --

6   MTel's sole expert regarding infringement of the accused

7   devices would severely hamstring MTel's ability to

8   prosecute its case at trial.

9           THE COURT:  Well, you have indicated that MTel

10:32AM 10   retained Dr. Bims in late February.  This motion was

11   filed in mid May.  Let's call it three months after that.

12   Is there any reason you can't get a new expert and put

13   yourself back in the same position you were with a

14   continuance of some similar period?

10:33AM 15           MR. TAYLOR:  No, your Honor.  And I believe

16   that would also implicate additional motions to be heard

17   today, specifically MTel's Motion to Compel, which may

18   have to bring additional discovery to light regardless.

19           THE COURT:  Well, if I grant the Motion to

10:33AM 20   Disqualify, my inclination would be to also grant time

21   necessary for MTel to get another expert.  And I guess

22   I'd like to hear from the defendant on that issue.

23           MR. TAYLOR:  Thank you, your Honor.

24           THE COURT:  Thank you, Mr. Taylor.

10:33AM 25           MR. LEVY:  Thank you, your Honor.

45

|  |  |
|--|--|
| | 1 |

Just a couple of points. Before I get to the other issue, I just wanted to remind everybody about the '428 patent which is in this case which addresses how a network reestablishes communication with a device. You know, I've heard some talk about transmission patents versus messaging patents. Transmission has been a major issue in this case. There are patents that deal with it.

But moving to the -- I appreciate that it may be difficult for MTel at this stage; but when this first came to light very -- I would say earlier on, back in April -- March and April, we offered -- we said, "Look, you guys have already submitted an expert report. Go out and get another expert and have him sign on to that expert report. We would be okay with that." It wasn't the -- it was -- from our perspective, it -- we weren't trying to sandbag them. This was a "Go out and get another expert. That would be fine."

THE COURT: I will accept your statement on that. I don't see anything in the record to make me think that.

MR. LEVY: The other thing I would say is, you know, the trial settings matter. We've exchanged pretrial disclosures. The final pretrial order is due I want to say Monday.

THE COURT: It's soon. I know the -- the

1  pretrial conference I think is August the 10th.

2  MR. LEVY:  Yes, your Honor.  And I think the

3  final pretrial order is due Monday.  I believe it's

4  Monday.  Motions in limine have been filed.  Exhibits

10:35AM  5  have been exchanged, you know, deposition designations.

6  We're working on jury instructions and verdict forms.  I

7  mean, we're quite a bit of the way there.  We've you

8  know, reserved rooms for trial.  I mean, we're pretty far

9  along.  And with all due respect to MTel's current

10:36AM  10  situation, we tried to work this out beforehand.  And it

11  would be difficult to put LGEMU in a position where we

12  have to kind of restart the process from three months ago

13  when we have been diligently working on this and trying

14  to get to a situation where we can, you know, resolve the

10:36AM  15  case.

16  THE COURT:  Well, if I tell you that granting

17  your motion would cause a continuance of the trial, do

18  you still want the relief sought in your motion?

19  MR. LEVY:  Yes, your Honor.  Just to reiterate

10:36AM  20  what we said earlier, three months ago we were -- or two

21  months ago, rather, we -- two months before the motion,

22  we had suggested "Find another expert, and this will be

23  fine."  We were okay with that then.

24  THE COURT:  All right.  Well, I can tell you

10:36AM  25  that I am going to grant the Motion to Disqualify

Dr. Bims; but I'm also going to grant MTel's request to
modify the current DCO to allow them to get another
expert.  That doesn't mean we're going to do a restart,
but I -- what I'd like to do is ask y'all to take a few
10:37AM  minutes now to see if you can come to any agreement about
what the minimum time would be that would be necessary to
accommodate another expert to replace Dr. Bims.

MR. LEVY:  Thank you, your Honor.  And just so
that we understand what we're talking about, is this
10:37AM  within the time left between now and trial?  That's -- or
considering that trial would have to be pushed out?  And
then how far?

THE COURT:  I'm thinking the trial would have
to be pushed out.  And my question to you is how far.

10:37AM  MR. LEVY:  Thank you, your Honor.  We'll
discuss with counsel.

MR. GARDNER:  Your Honor, can I ask one thing?

THE COURT:  Yes, Mr. Gardner.

MR. GARDNER:  Your Honor, the only thing,
10:37AM  respectfully, that worries me, if they're allowed to get
a new expert, what that new expert can do is wholesale
change up the case.  If you're suggesting they can get a
new expert that can essentially opine exactly as Dr. Bims
has opined, I think that's one issue; but if they have a
10:38AM  new expert that comes in and has completely new theories,

1 that's a vastly different situation. And I want to ask

2 what the court intends in terms of -- I mean, essentially

3 is this expert adopting Dr. Bims' opinion; or is this

4 expert going to wholesale reopen the case?

10:38AM 5 THE COURT: I would say neither one. Clearly,

6 I would not allow the expert to wholesale change the

7 case; but I'm not saying that the expert has to simply

8 sign on to whatever Dr. Bims has done before. I would

9 expect the expert would put it in his words and do it his

10:38AM 10 way, but I -- the understanding would be that we're not

11 going to just redo everything. We're just going to allow

12 them to get another expert. You know, that's easy to say

13 and I might have to get into the weeds and decide

14 specific issues later, but my intent would be that it

10:39AM 15 would be reasonably close to what Dr. Bims did.

16 MR. GARDNER: Your Honor, on that point as

17 well, my understanding is they have not served --

18 Dr. Bims didn't serve an infringement report as to two of

19 the patents so -- but the fact that he didn't serve a

10:39AM 20 report is irrelevant to the disqualification motion. He

21 just neglected to do it or MTel neglected to do it.

22 THE COURT: Well, is that what's addressed in

23 their motion to modify the DCO; in other words, that they

24 submitted a report that was a follow-up report?

10:39AM 25 MR. LEVY: Yes. That's part of the Motion to

49

Compel/Motion to Strike issue that I'm sure the court is

going to hear in just a few moments.

THE COURT:  Okay.  Well, I can tell you that

I -- you know, my inclination is to allow them to cover

10:40AM  whatever Dr. Bims has covered so far in -- through their

new expert and that would include the report that he

submitted two weeks after he should have and -- although

I'll listen to the argument on that and if it -- I'm not

at this point prejudging that, but certainly that's a

10:40AM  possibility.  I haven't heard what their explanation for

that is.

MR. LEVY:  We look forward to arguing that

particular motion this morning, your Honor.

THE COURT:  Okay.  All right.  Well, the

10:40AM  reason I want you to talk a little bit about what -- how

much time we need is that has some effect on these other

discovery issues that we're going to get into.  So, I'm

going to take a brief recess now and ask you to consult

about that; and we'll start back up in a few minutes.

10:41AM  Thank you.

(Recess, 10:41 a.m. to 11:07 a.m.)

THE COURT:  I understand that counsel have

agreed that we should take up the Emergency Motion to

Compel first.  So, we'll -- let's go to that.

11:07AM  MR. TAYLOR:  Thank you, your Honor.

1          THE COURT:  Mr. Taylor.

2          MR. TAYLOR:  MTel's Motion to Compel seeks to

3  compel a U.S. subsidiary tasked with marketing to U.S.

4  carriers the phones manufactured by its Korean parent to

11:07AM  5  produce documents relating to the technical operation of

6  the devices it sells.  The U.S. subsidiary seeks to avoid

7  its obligation by arguing that the documents are in the

8  possession of its Korean parent.  If this issue sounds

9  familiar, it's because it is.  In April, 2014, this court

11:08AM 10  held a hearing on the same issue, ultimately ruling that

11  the defendant in that case, Samsung Telecommunications

12  America, was under an obligation to produce documents

13  that were in the physical possession of its Korean

14  parent.

11:08AM 15          The court is familiar with the law on this

16  issue.  I have, nevertheless, collected a series of cases

17  that clearly lay out the obligations regarding discovery

18  that a party in this district faces.

19          Your Honor, may I approach?

11:08AM 20          THE COURT:  Yes, as long as you provide a copy

21  to both sides.

22          MR. TAYLOR:  The most important case, your

23  Honor, is on top.  *Kamatani v Benq Corp.*, Civil Action

24  No. 2:03CV437, 2005 Westlaw 2455825, from the Eastern

11:09AM 25  District on October 4th, 2005.  In that case Judge Ward

51

1  of this district held that a party is under an obligation

2  to produce documents when the party has the practical

3  ability, meaning the control in the ordinary course of

4  the business to obtain the documents.

11:09AM  5          MTel has diligently sought discovery of

6  information that the defendant in this case has the

7  practical ability to obtain.  On November 21st, 2014,

8  MTel first requested documents by specific category.  I

9  believe your Honor saw a copy of that letter earlier this

11:09AM  10  morning, and there's also a copy of that letter in the

11  folder that I have provided.

12          THE COURT:  Okay.

13          MR. TAYLOR:  This is also identified as

14  Exhibit A as part of MTel's Motion to Compel.

11:10AM  15          On December 11th, 2014, LG responded that they

16  did not possess the requested documents.

17          On January 22nd, 2015, MTel requested

18  documents between LG and the claimed third parties that

19  LG claimed possessed the documents.  In that letter, MTel

11:10AM  20  also identified the rog deficiencies listed in MTel's

21  Motion to Compel.

22          February 19th, MTel followed up via e-mail

23  regarding the documents.  LG responded on February 20th

24  promising a production of "next week."

11:10AM  25          THE COURT:  Where is your best statement of

1  what it is you're seeking that they maintain is in the

2  custody of the Korean parent?

3              MR. TAYLOR:  The November 21st letter included

4  in your folder, also attached as Exhibit A to MTel's

11:10AM  5  motion.

6              THE COURT:  Okay.  I have that, and that

7  apparently -- it appears to have 14 categories of

8  documents.  Is it your understanding that they maintain

9  that all of those categories are in the custody of the

11:11AM  10  parent rather than LG?

11              MR. TAYLOR:  It is my understanding that they

12  maintain that the documents are in the possession of

13  third parties, that those third parties are a split

14  between affiliates such as Google and other software

11:11AM  15  manufacturers, using Google as an exemplar, and its

16  Korean parent.  LG originally identified this third-party

17  category in its correspondence and it wasn't until MTel's

18  Motion to Compel that it first became clear that one of

19  those third parties was the parent company and that issue

11:11AM  20  fully came to light in LG's opposition to the motion.

21              LG had objected to discovery requests, noting

22  that it was a subsidiary entity; but those objections

23  were included with a host of additional other objections.

24  It wasn't until the opposition that it clearly became

11:12AM  25  evident that LG was using the same tactic as had appeared

in the *Samsung* case. And I believe that this is very

evident in LG's first supplemental response to

Interrogatory No. 7 which sought information regarding

the technical operation of the document -- of the accused

11:12AM  products and the protocols with which those accused

products were compliant. LG's initial response to that

interrogatory, according to Federal Rule of Civil

Procedure 33(d), identified numerous documents. Those

documents did not provide information regarding the

11:13AM  technical operation. And in response, LG supplemented

its response to say that LG is a domestic sales and

marketing company and therefore only has limited

information regarding the accused technical functionality

in this case.

11:13AM          THE COURT: All right. Well, thank you,

Mr. Taylor. I'll give you a chance to respond, but I

think I want to hear from LG on this subject.

          MR. TAYLOR: Thank you, your Honor.

          MR. GARDNER: May it please the court. Allen

11:13AM  Gardner. May I have just a moment, sir --

          THE COURT: You may.

          MR. GARDNER: -- to get my stuff?

          Your Honor, may I approach the other side's

table and your Honor's bench to give you some binders,

11:13AM  sir?

54

1          THE COURT:  Yes.

2          MR. GARDNER:  Your Honor, Allen Gardner for

3   Defendant LGEMU.  And respectfully, sir -- oh, wait.

4          Can I get the slides up?

11:14AM  5          Your Honor, Allen Gardner for Defendant LGEMU;

6   and respectfully, sir, that has not and that is not the

7   issue as has been explained to them as of Monday.  To be

8   very clear on the record, for purposes of any future

9   transcript or future proceeding, LGE Korea does not

11:14AM 10   consent to discovery via its subsidiaries.  It does not

11   believe that that is appropriate.  There are mechanisms

12   by which you can get discovery through the Hague or

13   through being sued.  However, I am familiar with this

14   court's practices.  I am familiar with the issues.  And

11:14AM 15   we have checked with LG Korea on every single document

16   they requested, and we either don't have it or it's in

17   the possession of third parties.

18          And, your Honor, if I can, I want to take you

19   through --

11:14AM 20          THE COURT:  When you say "we," you're talking

21   now just about U.S.?

22          MR. GARDNER:  No, sir, I'm talking about LG

23   Korea.  And if I can, I want to take you through -- it's

24   really easy to say, "Hey, we haven't produced technical

11:15AM 25   documents."  That's real easy to say, but the proof is in

the pudding.  And I'm going to go through, if it's okay
with you, every single category of documents to show you
exactly what we've done, why we've done it.
Respectfully, I believe at the end of the day you'll
11:15AM  agree that what we've done is more than satisfactory and
beyond what we ever would have had to have done.

THE COURT:  All right.

MR. GARDNER:  Okay.  Your Honor, if I can, I'd
like to briefly --

11:15AM  If I could go to Slide 3, Mr. Barrow.  I'm
sorry.

Your Honor, I've got a long timeline here and
I don't want to belabor it, but I may go back to it to
show you the diligence in this case and non-diligence
11:15AM  thereof.  But one thing I do want to point out, this case
was filed in 2013.  Okay?  We got the infringement
contentions on August 19th, 2014.  That was a year ago.
In the infringement contentions, they were replete with,
you know, Google does this, T-Mobile does that, Sprint
11:15AM  does this, AT&T does that.  There are references all
throughout to third parties.  Now, what we know from that
is MTel knew at least as of August, 2014, that there were
potentially third parties involved in this case.

Now if I can go to Slide 11, please.

11:16AM  Your Honor, from Slides 6 through 10 in front

56

1  of you, I've got plenty about the infringement

2  allegations.  I won't bore you but what I represent is

3  true and you can see it through the slides.

4  Now, on November 12th, 2014 -- if I can go to

11:16AM  5  Slide 12 -- the plaintiff sent a letter --

6  Can you go back?  Is that Slide 12?  Can you

7  go to Slide 12?

8  Slide 11, then.  Yes.

9  Slide 10.

11:16AM  10  Okay.  On December 21st, 2014, we got the

11  letter from plaintiff.  Okay?

12  And excuse me.  I realized it's not here.

13  It's later in the presentation.

14  They admit that.  They say -- and this is

11:16AM  15  cited from the Motion to Compel at page 2.  They say,

16  "Hey, we first told them about documents that we wanted

17  in November."  That's true.  So, they waited three months

18  after the infringement contentions were due; and they

19  said, "Oh, by the way, here's the documents we want."

11:17AM  20  Fair enough.  We're still under an obligation to produce

21  documents regardless; but here's when they first told us

22  what they want, realizing that they knew that third

23  parties were implicated.

24  If I can go to Slide 13.

11:17AM  25  And what Mr. Taylor just told you, sir, was

1 they never knew that we were talking about the LG

2 subsidiaries or we were talking about third-party

3 documents, we just never put them on notice. But, in

4 fact, on December 11th, 2014, we told them, "Look, there

11:17AM 5 are third parties that have information and LG Korea has

6 information but, nonetheless, you know, we -- we can't at

7 least get third-party information. Y'all know how to

8 subpoena folks." And at the very bottom it says, "If

9 MTel has any reason to believe that LGEMU possesses this

11:17AM 10 information, please let us know why; and if you want to

11 get on the phone, just please tell us. We'll be happy to

12 get on the phone." There was no phone call. There was

13 no e-mail. There was nothing. They said nothing.

14          And then later we produced discovery

11:17AM 15 responses.

16          If I can go to Slide 14.

17          We told them the exact same thing -- and this

18 is on December 29th -- "Look, LG's parent has some stuff

19 potentially and third parties have stuff." They were all

11:18AM 20 on notice of this at the end of December.

21          On January 22nd -- if I can go to the next

22 slide, Slide 15.

23          All they told us about on January -- this is

24 the first response we've had to any of these -- they say,

11:18AM 25 "Hey, what we need are these End User License

Agreements," these EULAs.  And I'm going to get to those

in just a second.  They said, "That's what we need, and

that's what we want."  They also referenced

interrogatories that have since been settled already, but

11:18AM that's what they told us they wanted.  They said, "Hey,

we want these EULAs."

If I could go to the next slide.

The e-mail that was just referenced by

Mr. Taylor said, "Hey, by the way," on February 19th,

11:18AM "hey, I need those EULAs.  Where are the EULAs at?  We

need the agreements between you and these customers and

folks."

Mr. Barrow responded on the 20th and said,

"Hey, I'm looking into that.  We're trying to get you

11:18AM that."

Now, on -- Slide 17.

It wasn't until March 5th, 2015 -- this has

tremendous bearing, in my opinion, on this whole

continuance issue and expert we'll get to -- that they

11:19AM finally said, "Oh, wait a second.  We want the EULAs;

and, oh, by the way, you've not given us some technical

documents."  That's in the bottom second paragraph.  They

hadn't said a word about this for four months, keep in

mind.  But they say again, "We've got to have those

11:19AM EULAs, and we haven't gotten any technical documents."

1    We came to the *Markman* hearing and a couple of

2 lawyers ran up to us real fast and said, "Hey, I want to

3 meet and confer with you.  We need to file this Motion to

4 Compel."

11:19AM  5    And we said, "Guys, you know, is there

6 something we can work out?  Can we work through this?"

7    And they said, "No.  We're going to file this

8 Motion to Compel as a placeholder; and if we can work

9 this out, we'll withdraw it."

11:19AM  10    And I said, "You know, it's not right to just

11 file placeholder motions; but if you feel like you got to

12 do it, you got to do it."

13    They did it.  They filed an emergency motion,

14 and they blamed us through the end of time for not

11:19AM  15 producing issues -- for not producing documents.

16    Now, let me tell you exactly why they are

17 wrong.

18    Go to Slide 19, please.

19    These End User License Agreements do not

11:19AM  20 exist.  And let me tell you why they don't exist.  I'll

21 give you five to ten reasons.  If I don't get to ten, you

22 can tell me.

23    One, as the court is aware, when you go to a

24 website or you download software or whatever, there's

11:20AM  25 always that "I agree/I don't agree" and if you don't

1 agree, you don't it.  That's an End User License

2 Agreement.  Basically you, the court, are the end user of

3 the software or whatever and you're saying, "Hey, I agree

4 to the terms."

11:20AM  5          Obviously LG is not an end user of Google.  LG

6 is not an -- what they want are End User License

7 Agreements between Google and between LG, whether LG

8 Korea or LG U.S.  That's what they said they wanted.

9 They do not exist.

11:20AM  10          Now, we have asked not only LGEMU, which

11 produced the MADA agreement -- which is the Mobile

12 Application Distribution Agreement, the only agreement

13 that we have in terms of an agreement with Google.  We

14 produced that to them months ago.  And they kept telling

11:20AM  15 us, "No, there's got to be this End User License

16 Agreement."

17          Well, before this hearing started -- and as I

18 explained to them -- we went to LG Korea because I wanted

19 to in come and make sure I had the dispute right, whether

11:20AM  20 we're saying we're not going to give you documents

21 because our parent has them or do our parents do not have

22 the documents.  We do not have this document because it

23 doesn't exist.

24          But you know what?  "We" being LG Korea and --

11:21AM  25 although LG Korea is not a party to this case, subject by

1  a reasonable disclaimer -- we don't have it.  But how do

2  we know that's true?

3          Because in April -- March/April, eight or nine

4  months after the infringement contentions were served,

11:21AM  5  plaintiff finally decided to issue one third-party

6  subpoena.  One.  After months of this case, one.  And

7  they issued it to Google.  And the very first category

8  out of the box was "I want any and all agreements you've

9  got with LG."  And do you know whether or not Google

11:21AM  10  produced that agreement?  They did not because it does

11  not exist.

12          As a matter of fact, yesterday I figured out

13  this is the second time that Google has been subpoenaed

14  by MTel.  In another case they have been subpoenaed.

11:21AM  15  Google was asked to produce this very document.  So,

16  either Google, LG, and the entire world are lying or the

17  plaintiff is wrong.

18          Another reason I know I'm right is because we

19  had a call on Monday and Mr. Taylor was on it and I was

11:22AM  20  on it and Mr. Levy and we had done public searching --

21  Mr. Barrow.  Excuse me -- and we had searched, like maybe

22  there's some reference to it.  Maybe it's called by a

23  different name.  Maybe there's something else out there.

24  And we were checking and checking and checking and

11:22AM  25  checking, and we couldn't find anything.  And we told

Mr. Taylor, we said, "Look, we don't have this stuff.

Our parent doesn't have this stuff.  Is there any other

name by which it would be called?  Is there any other

name by which you might know of it?  I mean, in all your

11:22AM  cases, of all your MTel cases -- you guys have sued

everybody carrier-wise and their mother -- has anybody

ever produced anything like this?"  The answer was "no."

            "Have you ever seen any document like this

with anyone?"  "No."

11:22AM           The only End User License Agreements that

exist, sir, exist between the customers, the end user

customers, like LG and a customer, Google and a customer,

Apple and a customer.  They don't exist between LG and

Google except for the Mobile Application Distributor

11:22AM  Agreement which we produced to them months ago.

            So, your Honor, respectfully, not only should

this motion be denied on that grounds, it's unfortunate

that we're here arguing about it because we explained

this yet again on Monday, this being the same exact

11:23AM  motion that was promised to be withdrawn if for some

reason this issue could not be there.

            Now turning to the technical documents.  Next

slide, please.

            As to all categories of technical documents,

11:23AM  we produced them, they're in the possession of other

63

1  wireless carriers, they're publicly available, or they

2  don't exist.  I want to go through each category in turn.

3          We can go to the next slide.

4          Teardowns, repair guides, and similar -- this

11:23AM  5  is Category 1 of the November 21st letter, which is

6  Exhibit A in the motion.  They want teardowns, repair

7  guides, and similar documents sufficient to show the

8  hardware components.

9          Your Honor, may I approach the bench very

11:23AM  10  briefly again?

11          THE COURT:  Yes.

12          MR. GARDNER:  Your Honor, I'm showing the

13  court one of the many, many, many, many technical

14  documents that has been produced in this case.  It's

11:23AM  15  about 200-something pages.  It's concerning just one of

16  the phones.  Just one of the phones.  We've given them,

17  to my knowledge -- every other phone they've accused,

18  we've given them the same document.  That is replete with

19  wiring diagrams, circuit diagrams, every piece of

11:24AM  20  hardware -- pin diagrams, flowcharts.  Everything in that

21  phone hardware-related is in that document.  We have

22  given them every single one of them.  Every single one of

23  them identifies the transceiver.

24          As a matter of fact, Mr. Barrow, can you show

11:24AM  25  that real quickly?

64

1        I'm sorry, your Honor.

2        Your Honor, for example, looking at the page

3  Bates stamped 054 at the end.

4        Go back up to the top.

11:24AM  5        This is the RF transmit/receive part.  Now,

6  this is just one example that they listed in that

7  category, realizing there's 200 pages of stuff like this,

8  not just this.  But it lists exactly the part numbers.

9  It says RF signal fed to the load noise amplifier RTR6500

11:24AM  10  LMA to the duplexer.  Then that's fed to the mixer,

11  RTR6500.  And in the RTR6500 the signal is changed

12  directly --

13        Excuse me.  I'm sorry if I'm going too fast

14  for you.

15        THE REPORTER:  A little.

16        MR. GARDNER:  I apologize.  I'll try to slow

17  down.

18        But it lists all the part numbers.  This is

19  just for the -- this is their one parenthetical of what

11:25AM  20  they want.  Well, we gave them much more than that.

21        If you can go to the next page.

22        Your Honor, you can see a flow diagram of

23  exactly what happens in that transceiver.  We've -- they

24  can see everything.  They can see all the parts.  They

11:25AM  25  can see all the components.  We've given them this.

1   Matter of fact, we've produced 82,000 pages of documents

2   to them.

3           I would ask Mr. Taylor to tell you what

4   exactly in these guides that we have produced they don't

11:25AM  5   have.  They have everything they need as to hardware.

6           What Mr. Taylor told you when he was arguing

7   the Motion to Disqualify was, "Your Honor, this is about

8   Google iCloud.  This is about unique, specific software

9   in Google iCloud.  This case isn't really about

11:26AM  10   hardware."  But nonetheless, we have complied fully with

11   that request; and we've given them everything we've got.

12           Next category, please.

13           THE COURT:  I tell you what, Mr. Gardner.  Let

14   me just make sure I understand what you're saying.  You

11:26AM  15   have provided everything responsive that your client has.

16           MR. GARDNER:  Yes, sir.

17           THE COURT:  You have asked LG Korea and you

18   have produced what they have that's responsive?

19           MR. GARDNER:  Yes, sir.  It -- just to be

11:26AM  20   clear, though, I mean, they would have -- like this is

21   the -- what's the name?  This is the service manual.

22   This is the same document that they would have.  I mean,

23   essentially this is the hardware guide to the phone.

24   Now, I'm not saying there's not some other document

11:26AM  25   somewhere that describes the hardware of the phone; but

1   this is the document that describes the hardware in the

2   phone and how it works.

3                THE COURT:  Okay.

4                MR. GARDNER:  But specifically for purposes of

11:26AM   5   all the categories where they said, you know, we didn't

6   check with LG Korea, we have.  And I really want to take

7   the court through each one of those.

8                THE COURT:  Okay.  And then tell me what your

9   position is regarding documents in the possession of the

11:27AM   10   third parties other than LG Korea.

11                MR. GARDNER:  I'll tell you exactly.  One,

12   respectfully, your Honor, it's not my job to conduct

13   third-party discovery.  It's not my job.  Respectfully,

14   it's not my job.  But what we have done, we have gone

11:27AM   15   well above and beyond what we were supposed to do.  Keep

16   in mind these folks have lawsuits pending against most of

17   these third-party folks.  They've got their documents

18   anyway.  But what they say to us now is, "Oh, by the way,

19   we need third-party stuff."

11:27AM   20                Our in-house counsel went to every single

21   one of the -- both the legal department and the business

22   side and said, "Hey, plaintiff is asking us for this

23   information.  Can we please produce this information?"

24                And they said, "No.  If plaintiff wants to

11:27AM   25   subpoena us, plaintiff can do that."

1    Plaintiff has not subpoenaed these folks.

2         THE COURT:  So, what you're saying then is

3    that your client has responsive third-party documents but

4    is not permitted to produce those because of

5    nondisclosure agreements with those third parties?

6         MR. GARDNER:  No, sir, I'm not saying that.

7    We have produced everything we have.  The only things we

8    haven't produced that they want us to produce are for me

9    to go to Google's headquarters and demand that they

10   produce Google iCloud documents.  That's the only thing

11   that we haven't produced to them.

12        THE COURT:  All right.  So, you've produced

13   everything you have; and the question then would be

14   whether you're under any legal obligation to produce or

15   to obtain documents from those third parties that you

16   don't currently possess.

17        MR. GARDNER:  Yes, sir.

18        THE COURT:  Is that right?

19        MR. GARDNER:  Yes, sir.

20        THE COURT:  Okay.

21        MR. GARDNER:  And, respectfully, I mean, there

22   is no legal obligation; but we've done well more than

23   we -- we went way beyond, you know, what we were supposed

24   to do.  We could have said, "Hey, jump off a bridge."  We

25   didn't.  We actually contacted them and said, "Plaintiff

1  wants these documents.  Will you produce them."

2         And they said, "No."

3         THE COURT:  Mr. Gardner, then I'm going to

4  interrupt you at this point and ask Mr. Taylor to respond

11:29AM  5  to what you've said thus far; and then I'll give you a

6  chance to go further if we need to.

7         MR. GARDNER:  Thank you, sir.  And please

8  forgive me for talking so fast and maybe loud, too.  I'll

9  try to cut it out next time.

11:29AM  10         MR. TAYLOR:  Thank you, your Honor.

11         I would like to first correct a few issues

12  that were raised during opposing counsel's last

13  presentation.  Specifically when in December counsel for

14  LG informed counsel for MTel that the documents were in

11:29AM  15  the hands of third parties, counsel for MTel requested

16  documents showing the extent of control that LG had over

17  those third parties.  These were not merely End User

18  License Agreements between end user customers but

19  specifically in each of the documents and correspondence

11:30AM  20  that counsel put on the screen, it says "and agreements

21  between LG and those third parties."  Not just end users,

22  not just End User License Agreements.  We sought those

23  documents.  LG responded that they did not possess them,

24  they were in the possession of the third party.  In order

11:30AM  25  to show that LG had the practical ability and the control

1    over those documents, we requested agreements between LG

2    and those third parties.

3         As time went on and promises that the

4    documents and the agreements were on their way were made,

11:30AM  5    at the Claim Construction Hearing we stated we would file

6    the Motion to Compel, as the deadline was quickly

7    approaching.  LG, in response, promised to make a

8    production of documents; and we stated that if that

9    production resolved the issues, we would withdraw the

11:31AM 10    issue -- we would withdraw the motion.  It was not merely

11    a placeholder report, but it was a report filed in the

12    face of continued promises that the documents were on

13    their way and not having seen them.

14         THE COURT:  All right.  I understand that.

11:31AM 15    And I -- what I'd like to know is:  What evidence do you

16    have that LG has not produced to you all of the

17    responsive documents that are in their possession?

18         MR. TAYLOR:  I would direct your Honor to the

19    deposition of LG's corporate representative, a

11:31AM 20    Mr. Nafei --

21         Excuse me if I'm mispronouncing that.

22         MR. LEVY:  If I may, your Honor, it's Nafei

23    (pronouncing).

24         MR. TAYLOR:  Thank you.  Nafei (pronouncing).

11:31AM 25         -- a Mr. Nafei that is included in the folder

that I handed up.  It occurred on April 2nd, 2015.  And
these are just excerpts from that deposition.  The
deposition is close to three to 400 pages, and these are
just some of the numerous examples wherein the witness

11:32AM    was able unable to answer on behalf of LGEMU -- or excuse
me -- stated that the information was not possessed by
LGEMU but he did not know if it was possessed by LG
Korea.  There are instances where the witness -- on page
57, line -- starting at line 7, the witness was unaware

11:32AM    of what the GCM, Google Cloud Messaging application --
this is an application that is running on LG devices and
is responding to the Google Cloud service -- what GCM
even stood for.

THE COURT:  Well, I guess what I'm looking for

11:32AM    is evidence that LG has not produced to you all of the
responsive documents that are in their possession.  And
the fact that this witness may have said he didn't know
if LG Korea had it is not really what I'm after.  Do --
and I know that -- I'm trying to take this point by

11:33AM    point.

Do you have any reason to believe that you
haven't gotten all of the documents that are in their
possession that are responsive to your request?

MR. TAYLOR:  Within their physical possession,

11:33AM    no, your Honor.

1          THE COURT:  Okay.  Now, you've just heard what

2     Mr. Gardner had to say about responsive documents in the

3     possession of LG Korea.  What evidence do you have that

4     LG Korea has responsive documents that you have not had

11:33AM  5     produced?

6          MR. TAYLOR:  There is testimony -- I was

7     looking for the exact citation, and I cannot see it at

8     this moment.  But there is testimony in the deposition of

9     Mr. Nafei -- sorry -- and that states that Google -- or

11:34AM 10     excuse me -- that LG employs engineers that write

11     software -- that write code and that LG Korea has that

12     information.  LGEMU has not produced any source code, and

13     correspondence between the parties suggests that LGEMU

14     took the position that they did not possess it because it

11:34AM 15     was -- it belonged to LG Korea.

16          THE COURT:  Okay.  And tell me where that is

17     in your November letter.  Which category would that fall

18     within?

19          MR. TAYLOR:  Your Honor, I believe that falls

11:35AM 20     in -- under Category 2 and Category 3 which requests

21     protocol documents, state-flow diagrams, and/or

22     flowcharts showing the communication.  These documents

23     will -- are often tied in connection with the source

24     code.  State-flow diagrams and flowcharts specifically

11:35AM 25     are often used to describe the operation of the source

1 code.

2          THE COURT:  Okay.  But that's -- that doesn't

3 constitute a request for the source code.  Is there a

4 request in here for source code?

11:35AM    5          MR. TAYLOR:  No, your Honor, not in this

6 letter.

7          THE COURT:  How is it at issue in this motion,

8 then?

9          MR. TAYLOR:  The specific source code

11:36AM   10 production is not explicitly identified in this motion.

11 It is implicated through the request of other documents,

12 including identification of the --

13          THE COURT:  Let's talk about what is at issue

14 in this motion.

11:36AM   15          MR. TAYLOR:  Yes, your Honor.

16          THE COURT:  So, is there anything that you can

17 point to that suggests that what Mr. Gardner said about

18 LG Korea is not accurate?

19          MR. TAYLOR:  Your Honor, there is nothing that

11:36AM   20 we have that I can disprove -- or excuse me -- that can

21 prove a negative, that can prove that LG Korea, against

22 reason, does not have the information, that there -- we

23 know -- we have proof that LG Korea has source code.  We

24 have proof that --

11:37AM   25          THE COURT:  You haven't shown me that source

1  code relates to this motion.

2          MR. TAYLOR:  Yes, your Honor.

3          THE COURT:  So, what I want to hear about is

4  what relates to this motion.

11:37AM  5          MR. TAYLOR:  Yes, your Honor.  And excuse me

6  if I was not clear.  The point I was trying to make is we

7  have proof that they do have source code.  It stands to

8  reason that in every other case, every other software

9  defendant, every other software entity such as this, when

11:37AM  10  they have source code, they have documents describing the

11  source code.  An engineer isn't going to just sit down

12  and start writing.  They have design documents.  They

13  have technical documents that describe the objectives

14  that the source code will meet.  And those documents are

11:38AM  15  requested in Categories 2 and 3.

16          The -- although -- excuse me.  The evidence

17  shows that they do have source code that has not been

18  produced.  I understand that that is not explicitly

19  listed under this motion and is therefore not an issue in

11:38AM  20  this motion.  The implicit understanding of that is that

21  these other documents exist.  The unfortunate situation

22  is because we have not been able to depose anyone from LG

23  Korea or to talk with anyone from LG Korea and instead

24  only have the testimony of LGEMU's witness who simply

11:38AM  25  says, "I don't know what they have."

74

1          THE COURT:  Why have you not deposed anyone

2     from LG Korea?

3          MR. TAYLOR:  Because it is our understanding

4     that when the subsidiary has the practical ability to

11:38AM  5     obtain the documents, it was under their obligation to do

6     so.

7          THE COURT:  Okay.  Well, you just said you've

8     not been able to.  Did you mean to say you have chosen

9     not to?

11:39AM  10         MR. TAYLOR:  I meant to say that we -- by the

11    time this deposition occurred and we learned that LG

12    Korea did have these company -- did have these documents

13    but LGEMU's witness was unable to say what they did or

14    did not have, the discovery period had closed.

11:39AM  15         THE COURT:  So, it's just -- it was something

16    that you did not accomplish during the discovery period.

17         MR. TAYLOR:  Yes, your Honor.

18         THE COURT:  Okay.  Tell me why the flow

19    diagrams and -- flowcharts, state-flow diagrams, protocol

11:39AM  20    documents, why are they not covered in these various

21    manuals that you have been produced?

22         MR. TAYLOR:  Yes, your Honor.  Those manuals,

23    as counsel pointed out, go to the hardware.  The claims

24    definitely implicate hardware to some extent.  You have

11:40AM  25    various "means for" claims that implicate structure.

75

Hardware is structure.  But those do not go to the

software -- the application which, as we discussed

earlier this morning, is at the heart of the accused

functionality.

11:40AM
            THE COURT:  All right.  The software is not

what LG distributes in this country?

            MR. TAYLOR:  They distribute phones that

are -- that have the software installed on them.

            THE COURT:  Okay.

11:40AM
            MR. TAYLOR:  It is LG Korea that loads that

software onto the phones, presumably in Korea, although

that is a presumption.

            THE COURT:  And in the cases that you made

reference to before -- the cases that I'm familiar with

11:41AM
deal with the technical information about the devices

that the U.S. subsidiary sells.  Have you seen cases --

can you point out to me cases that directly address the

software that resides on those devices and whether or not

the U.S. subsidiary has been found to have an obligation

11:41AM
to provide that as well?

            MR. TAYLOR:  There is nothing that comes to

mind, your Honor.  However, it is MTel's position that

the devices that LG is selling in this country include

that software.  They're not selling blank devices that

11:42AM
the customer has to then go load their software on.

1  They're selling and marketing the benefits of the

2  software on their devices.

3         THE COURT:  Okay.  So, you've talked about 2

4  and 3, then.  Do you have any indication that there's

11:42AM  5  anything else that LG Korea has that's responsive to your

6  request and has not produced?

7         MR. TAYLOR:  Your Honor, I would argue that

8  the same reasoning also applies to Category 4 which

9  specifically deals with the emoticons, including how the

11:42AM  10  files corresponding to the emoticons are stored.  This is

11  also going to be implicated with the LG Korea installing

12  the software onto the device, where that file is stored

13  on the specific -- or the hardware on the specific LG

14  device.

11:43AM  15         Testimony in the deposition also implicates

16  Category 5.  The deponent was asked how they choose

17  various features, and he stated that that was a function

18  of LG Korea and that as an LGEMU employee he did not

19  know.

11:43AM  20         Category 6, your Honor, is not at issue.

21         Category 7 is implicated as part of Categories

22  2 and 3.  This is just a specific application of the

23  software, discussing how a very specific function

24  operates.

11:43AM  25         As well as 8 -- Category 8.

1          Categories 10 -- Category 9 is not at issue,

2     your Honor.

3          Categories 10, 11, 12 -- 10 through 12, these

4     were all categories of documents and information that the

11:44AM   5     witness -- the deponent was asked about during his

6     deposition and provided the same answer, that this is

7     functions of LG Korea and not of LGEMU.  Now, whether

8     these are specific documents or if it is information

9     regarding the documents or information regarding the --

11:44AM  10     excuse me -- evidence regarding the information contained

11     within these documents, I'm not a hundred percent clear

12     on that.  Whether, you know, they have a document

13     explicitly listing it or if LG Korea is in possession of

14     the information as to this document, I -- regardless,

11:44AM  15     LGEMU's witness was not able to provide any information

16     via testimony on this issue under the reasoning that it

17     was LG Korea's responsibility.

18          Now, Documents 13 and 14 are what I would just

19     call "litigation documents."  It's not something

11:45AM  20     specifically that LG Korea would have, with the

21     understanding of an exception that if at trial LGEMU

22     plans to use a document that was in the possession of LG

23     Korea, then that document would fall under Categories 13

24     and 14.

11:45AM  25          THE COURT:  All right.  Now, talk to me about

1  documents that are in the possession of third parties

2  that are other than LG Korea.  Why do you contend that LG

3  has an obligation to reach out to those parties and

4  gather documents?

11:45AM  5          MR. TAYLOR:  Yes, your Honor.  The case law on

6  this also uses the term "affiliate."  And we believe that

7  through the practical day-to-day operations, testimony

8  from LGEMU's corporate representative shows that LG Korea

9  goes through LGEMU to facilitate communications between

11:46AM  10  LG Korea and Google.

11          THE COURT:  I think that the word "affiliate"

12  as used in those cases is referring to some ownership

13  interest, not simply the fact that the companies do

14  business.  You're using "affiliate" more in the broad

11:46AM  15  sense like Amazon uses it, that every -- all of their

16  trade partners are affiliates?

17          MR. TAYLOR:  Understood, your Honor.  As

18  counsel for LG pointed out, we do have a third-party

19  subpoena standing that once again also, unfortunately,

11:47AM  20  ran to the end of the originally noticed discovery

21  deadline.  However, we did -- we were able to reach an

22  agreement with outside counsel for Google wherein if the

23  court reopened discovery, that Google would produce

24  additional documents.

11:47AM  25          THE COURT:  All right.

1        MR. TAYLOR:  Your Honor, another point is from

2   early on in this case we have been requesting the

3   agreements between LG, whether that's LG Korea or

4   LGEMU -- it's a little murky on exactly how they split it

11:47AM  5   up -- but agreements between LG and these third parties

6   that would enable MTel to demonstrate LG's control over

7   these third parties.  And as your Honor pointed out, this

8   is an -- the level of control is a factor in determining

9   an obligation to produce documents.  We have requested

11:48AM 10   the agreements that would show that level of control and

11   have yet to see those agreements.

12        I understand that it is LG's position that

13   those documents simply do not exist.  I find that

14   incredulous to believe that a -- two major entities

11:48AM 15   responsible for millions of dollars' worth of profit do

16   not have any agreement between themselves, especially

17   when one entity is providing software that operates on

18   the hardware of another entity.

19        THE COURT:  All right.  I'm going to ask

11:48AM 20   Mr. Gardner to respond to the items from your November 21

21   letter that you maintain LG Korea should have, and I'll

22   get back to you.

23        MR. TAYLOR:  Thank you, your Honor.

24        MR. GARDNER:  Your Honor, I have much to say;

11:49AM 25   but if you want me to go through these categories, I'll

1 go over those categories first.

2      THE COURT:  You can tell me first generally.

3 You've heard the discussion.  Is it your position that

4 you have inquired of LG Korea about each of the things

11:49AM 5 that Mr. Taylor just talked about and that they have

6 advised you they don't have responsive documents?

7      MR. GARDNER:  Yes, sir, but let me tell you

8 why.  Let me tell you -- you don't just have to take my

9 word for it.  I'll show you why that is true.

11:49AM 10      One thing that's important to note -- have you

11 seen that Beckham -- that David Beckham -- that

12 soccer-player guy commercial that plays?  I think it was

13 the Super Bowl.  He runs to like the Sprint store and he

14 wants a plan and he runs to the Verizon store.  He goes

11:49AM 15 to all these different stores, like, "Hey, I want a plan"

16 or text messages or whatever.  And he finally finds one

17 he likes.  The one place he didn't go was an LG store,

18 and the reason for that is because LG doesn't operate a

19 network.  The carriers operate networks.  LG doesn't have

11:50AM 20 any network whatsoever.  What LG does is assemble

21 hardware and sell a phone to T-Mobile, for instance, who

22 operates the network and then T-Mobile does whatever it

23 does as to the network.  LG doesn't do anything as to the

24 network, has no networks, has never had a network, has no

11:50AM 25 control over the networks; and it would be preposterous

1 for T-Mobile to -- you know, for T-Mobile to just turn

2 over their cell networks to LG is preposterous.

3          But let me take each category in turn.

4          THE COURT:  All right.

11:50AM   5          MR. GARDNER:  If I can go to Category 2,

6 page -- Slide 22.

7          This "protocol documents" asks for diagrams

8 and flowcharts showing the communication between an

9 accused device and the relevant server.  That is not us.

11:50AM  10 As Mr. Taylor said in the very beginning of this case,

11 this is about very unique software, such as Google

12 iCloud, that deals with how those devices -- how they

13 communicate with T-Mobile's network or somebody else's

14 network or somebody else's server.  LG doesn't have

11:51AM  15 servers.  Obviously they have their own internal like --

16 I assume like the court has a server or something

17 where -- that handles computers.  We don't do that.  We

18 don't have any of those.  All we have are phones and

19 hardware that have -- you know, Android -- the Android

11:51AM  20 code is on those phones, and that's all publicly

21 available.  You can go right now and download the whole

22 thing.  All that code is there.  There's also embedded

23 Qualcomm code and other third-party chip code that's in

24 the chips themselves that we don't have access to.

11:51AM  25 Obviously the third parties do.  We don't have any of

82

1  these.  LG Korea doesn't have any of these; LGEMU doesn't

2  have any of these.  The people that do are Google, and

3  they subpoenaed Google.

4              And, respectfully, if they had come to me and

11:51AM  5  said, "Allen" -- they got what they needed, in my mind.

6  They got 8200 pages of documents -- 8,000 pages of

7  documents from Google.  If they had come to me and said,

8  "Allen, you know, we just need a couple more weeks.  We

9  want a few more documents from Google," by golly, I mean,

11:52AM  10  you can extend that discovery period in perpetuity for

11  that purpose.

12              However, they've already subpoenaed Google.

13  They've subpoenaed them twice.  They got what they want

14  from Google.  The reason they had to subpoena Google is

11:52AM  15  because this is all Google's stuff.  It's T-Mobile's

16  stuff.  It's not -- this is not our stuff.  So, we don't

17  have --

18              THE COURT:  Okay.  Let's go on to 4, then.

19              MR. GARDNER:  Excuse me, sir?

11:52AM  20              THE COURT:  I understand your position on

21  that.  Let's go on to Category 4.

22              MR. GARDNER:  Yes, sir.  Category 4.  This is

23  even better.  I am old-school to some extent because I

24  still use smiley faces.  Now these emoticons and emojis

11:52AM  25  are everywhere.  You can get thumbs-up, beer signs, music

1  signs.  You can get whatever you want, a sign.  I don't

2  have -- maybe I do.  I don't know.  But I use smiley

3  faces.  We don't design emoticons.  We don't design

4  emojis.  We have nothing to do with that.  That is

11:53AM  5  Google.  Google has zillions of them.  I'm sure Apple

6  probably has those; Samsung has some.  We don't do that.

7  We don't design that.

8           THE COURT:  What about 5?

9           MR. GARDNER:  5.  Excuse me.  That's the

11:53AM  10  same -- when it talks about the design documents of the

11  accused application, the accused application is the

12  network, how Google iCloud interfaces with the network,

13  how -- whether or not we had -- like if we had, for

14  instance, an LG mail system like Google -- like Google

11:53AM  15  has a G-mail system, if we had an LG mail system, how

16  that would interface.  We don't have any of that.  All of

17  that happens with third parties.  Every ounce of it

18  happens with third parties.

19           THE COURT:  All right.  The letter defines

11:53AM  20  "Accused Applications."  So, help me understand.

21           MR. GARDNER:  Yes, sir.

22           THE COURT:  That's under A on the first page

23  of the letter.

24           MR. GARDNER:  Yes, sir.

11:54AM  25           THE COURT:  There we go.

84

1          MR. GARDNER:  Okay.  The "'Accused

2  Applications' means the applications identified in MTel's

3  Infringement Contentions."  I've got those.

4          LG E-mail Application, we don't have that,

11:54AM   5  your Honor.  That's like G-mail.  We don't have LG mail.

6          LG Browser Application.  Mr. Taylor just said

7  for the first time that's not at issue.  Well, it's not

8  been -- we've known all along it's not an issue because

9  we don't have an LG browser, but that's the first time

11:54AM  10  he's admitted as of today.  We don't have control over

11  Google Cloud Messaging (GCM) and/or Windows Push

12  Notification Service.  That is Microsoft.

13          THE COURT:  Is the same true of the Calendar

14  Application and the Messaging Application?

11:55AM  15          MR. GARDNER:  Yes, sir.  Yes, sir.  We don't

16  have -- there's no LG calendar.  There's no LG mail.  We

17  don't do that; and we've told them that, respectfully,

18  time and time and time again.  Nonetheless, we have an

19  emergency motion that's seeking to extend numerous

11:55AM  20  deadlines in this case.

21          THE COURT:  All right.  I think Category 5

22  also deals with the accused applications.

23          MR. GARDNER:  Category 7, sir?

24          THE COURT:  5.

11:55AM  25          MR. GARDNER:  Yes, sir.  And we just talked

1    about -- if you want to keep talking about it, we can.

2              THE COURT:  No.  I think we've covered 5 and

3    6, then.

4              MR. GARDNER:  Yes, sir.

5              THE COURT:  7.

6              MR. GARDNER:  7, 8, 9.

7              THE COURT:  7 and 8 are both -- I think you've

8    already addressed those.

9              MR. GARDNER:  Yes, sir.

10             THE COURT:  And what about 10 through 12?

11             MR. GARDNER:  We have produced license

12   agreements to them; and we have produced the Mobile

13   Application Distribution Agreement, which is the "MADA,"

14   with Google.  That's actually between LG Korea and

15   Google; and what that says is, "If you're going to build

16   an Android phone, you got to do it this way.  If you're

17   going to use Android -- you can't modify.  Here's how you

18   got to do it."  That's the agreement we have with Google.

19   That's the only agreement we have with Google.

20             We asked actually as of Monday -- I mean, I

21   don't know.  Maybe it's a purchase order or something.

22   We asked as of Monday "Is there any other -- name of any

23   other type of agreement you want us to look for?"

24             And Mr. Taylor said, "I want any and all

25   agreements that deal with Google iCloud.  If there's

86

1  anything regarding Google iCloud, I want to get that."

2      We went back yesterday again, LG Korea, "Do we

3  have any agreement with Google regarding Google iCloud or

4  anything like that?"  And again they confirmed "no."

11:56AM  5      THE COURT:  Okay.

6      MR. GARDNER:  The agreement we have with

7  Google is the Mobile Application Distribution Agreement

8  which we have produced to them.

9      THE COURT:  Tell me about 11 and 12.

11:56AM  10      MR. GARDNER:  Yes, sir.  We have produced

11  those.  We have produced them.  We have produced all

12  financial information to them.  They've got the cost of

13  goods sold.  They've got that.  As a matter of fact, I

14  don't think this is at issue -- your Honor, that's not at

11:57AM  15  issue in the motion, to my knowledge, today; but we have

16  produced that to them.

17      THE COURT:  Okay.  All right.  Thank you,

18  Mr. Gardner.

19      MR. GARDNER:  Bills of materials, I can

11:57AM  20  clarify that's in the service manual; but I don't believe

21  those two issues were at issue today.  That's why I

22  didn't have them on my slides.

23      But, your Honor, if I can, again, we have done

24  all we had to do and much, much more.  And, your Honor,

11:58AM  25  it's not just about software.  It's -- we cannot -- I

1 mean, they can issue a third-party subpoena. There are

2 hundreds of them issued daily in the Eastern District of

3 Texas. They can issue from this court, and it takes a

4 mere ten minutes. It's like why in the world if you

11:58AM 5 truly believe third parties -- you know, you know they're

6 implicated because they're in the infringement

7 contentions; and you can't even serve a third-party

8 subpoena. I've served hundreds of them, respectfully.

9          THE COURT: Thank you, Mr. Gardner.

11:58AM 10          MR. GARDNER: Yes, sir.

11          THE COURT: Mr. Dacus.

12          MR. DACUS: Your Honor, may I address this

13 cost of goods sold issue quickly?

14          THE COURT: Yes.

11:58AM 15          MR. DACUS: Because it's an issue that at

16 least I believe I'm familiar with. They may prove me

17 wrong. But I do not believe we have received the cost of

18 goods information. If you listen closely to what

19 Mr. Gardner said, he said, "We have produced all

11:58AM 20 financial information." So, what that really means is

21 they've given us some LGEMU financial statements which

22 contain a line item that says "cost of goods sold"; but

23 as the court is familiar with from other cases, that's

24 really just a transfer price from the Korean entity to

11:59AM 25 LGEMU. We don't have true cost of goods related to these

88

1 products that I'm aware of.  If we have them, certainly

2 I'll accept LG pointing us to them.

3          THE COURT:  Well, just while you're up there,

4 Mr. Dacus.

11:59AM  5          MR. DACUS:  Yes, sir.

6          THE COURT:  You've heard Mr. Gardner's

7 response on these.  Is there anything else besides the

8 cost of goods sold that you think you can make a showing

9 that LG has not adequately produced?

11:59AM  10          MR. DACUS:  The first thing that comes to

11 mind -- I may have to draw upon Mr. Taylor to help me

12 answer this question.  But with respect to the category

13 that involves licenses, your Honor, I don't believe we

14 have licenses from the Korean entity and -- but testimony

12:00PM  15 is -- let's see -- from again Mr. Nafei, and I'm looking

16 on page 229 of his deposition.  He said that that

17 information would reside at the Korean entity.

18          THE COURT:  This request is worded in an

19 interesting fashion.  It says "License agreements that LG

12:00PM  20 believes are applicable to the accused functions."

21          MR. DACUS:  I've read it while the hearing is

22 ongoing, judge; and I'm not going to argue with you that

23 it could have been worded better.

24          THE COURT:  Well, I mean, it sounds like it's

12:00PM  25 designed to prevent LG from later offering up other

89

1 licenses.

2 MR. DACUS: That's certainly one purpose.

3 THE COURT: But in any event, what am I to do

4 if LG says, "We have produced all the licenses we believe

12:01PM 5 are applicable to the accused functions? Which is what I

6 have heard from them.

7 MR. DACUS: Understood, your Honor, and far be

8 it from me to tell the court what to do but I do think an

9 order is appropriate ordering them to produce those; and

12:01PM 10 if the response to that order is there are none, then

11 that's the response. I find that hard to believe; but I

12 certainly don't have any proof to show to the court

13 today, from any witness or any testimony or any document,

14 that in fact LG Korea has those licenses. I don't have

12:01PM 15 that today.

16 THE COURT: Well, I guess the -- you know, the

17 request relates to the accused functions; and when I look

18 at the definition of "accused functions" on the first

19 page of the letter, those appear to be software functions

12:01PM 20 that would be covered by the argument Mr. Gardner just

21 made about the software coming from the -- whoever

22 they're selling the device to, T-Mobile or Google or

23 whatever.

24 Do you have anything that you can point me to

12:02PM 25 that would indicate that -- any reason I should believe

1 they have licenses for these accused functions?

2          MR. DACUS:  I don't have any express evidence,

3 your Honor.  That's -- I think, as Mr. Taylor said

4 earlier, reason sort of dictates that they would but I

5 certainly have heard them represent that they do not and

6 I do not have any direct evidence to point the court to

7 today.

8          THE COURT:  Okay.  Now, you have said that you

9 don't believe that you have received anything about the

10 cost of goods sold other than perhaps a line item on a

11 financial report.

12          MR. DACUS:  That's my belief, your Honor.

13          THE COURT:  Okay.  Then I will ask Mr. Gardner

14 to respond to that.

15          MR. GARDNER:  Your Honor, if you can look at

16 the screen, sir.  We produced this document to them.

17 It's a massive spreadsheet.  It's got COGS, fixed costs,

18 margins, market, service, R&D, SGB, headquarter, other,

19 operating income -- and again, I'm sorry.  I took a

20 couple of accounting classes in college, and I'm not --

21          THE COURT:  What is it broken down by?  In

22 other words, is this by device or by what?

23          MR. GARDNER:  Your Honor, may I let Mr. Levy

24 jump in just for a second and tell you a little bit more

25 about that?

1          THE COURT:  Yes.

2          MR. LEVY:  Your Honor, thank you.  If I may.

3          Mr. Barrow, if you could scroll to the left.

4          Every device for every quarter -- you know,

12:03PM  5  you can see the LGUS740 is the model, you know, for Q4

6  November 2010.  There's a model suffix which indicates,

7  you know, who this was sold to, that kind of thing; and

8  then -- and it goes for I think a few thousand lines

9  because each phone has, you know, many different colors

12:04PM  10 and -- and it's broken down that way, too.  And then all

11 the variable costs are broken out, and all the fixed

12 costs are broken out.

13          THE COURT:  Show me, for instance, as you

14 scroll across horizontally, what kind of information

12:04PM  15 you've got there.

16          MR. LEVY:  Yes, your Honor.  So, sales, gross

17 sales, sales productions.

18          Keep going.

19          I'm going to try to remember.  So, all the Vs

12:04PM  20 are the variables.  All the Fs are the fixed.  So,

21 there's, of course, the variable costs; and then

22 there's -- there's marketing, royalties,

23 transportation -- I can't remember what that G&A is --

24 manufacturing.  And then you go into fixed costs, and it

12:04PM  25 continues, cost of goods, royalty.  A lot of the same

1  costs that would be variable have fixed components as

2  well.  And headquarters, that's another fixed cost, I

3  believe.

4       It's -- and this was all covered in the

12:04PM  5  deposition of Dr. Nafei when they went through.  They

6  asked quite a few questions about the spreadsheet.  It's

7  a pretty comprehensive bit of financial information.

8       MR. GARDNER:  Your Honor, if I can.  What

9  plaintiff told you a second ago is that we don't have any

12:05PM  10  information about COGS except a line item on like a SEC

11  statement or something.  We've given them tremendous

12  amounts of detail.  And, I mean, I didn't even, frankly,

13  know that this was necessarily going to be an issue today

14  because I think the Motion to Compel concerned technical

12:05PM  15  documents and the EULAs.  However, we have given them

16  these things; and they have these things.

17       And I know -- Mr. Dacus is a good friend of

18  mine, a great guy.  I know he doesn't know all about the

19  financial details, as do I not; but the court can see

12:05PM  20  that there is a tremendous amount of details in terms of

21  each phone, each cost, fixed costs, variable costs.

22  There -- you know, there shouldn't be any issue in this

23  case about the level of financial detail.

24       THE COURT:  All right.

12:05PM  25       MR. DACUS:  Your Honor, may I address that?

93

1          THE COURT:  You may, Mr. Dacus.

2          MR. DACUS:  The issue here is not that they

3    gave us a bunch of line items or a bunch of columns.  The

4    issue is what are those numbers based on.  Are they based

12:06PM  5    on the true cost, or are they based on a transfer price

6    from the Korean entity to the LGEMU subsidiary?  That's

7    really the issue.

8          I understand that the 30(b)(6) witness was

9    unable to tell us that.  What we've heard from LG

12:06PM  10   consistently throughout this case is that they were

11   unable to get information from the Korean parent.  So,

12   our assumption has been and continues to be today that

13   the numbers they have given us are not the true cost

14   numbers but, rather, numbers based on the transfer

12:06PM  15   pricing.  And as the court knows, that's an issue in

16   damages, what's the true amount of profit that these

17   folks are making on these products.  So, that's the

18   issue, not did they give us a spreadsheet with a bunch of

19   line items.  They certainly did but --

12:06PM  20         THE COURT:  Well, so, you know, you've got a

21   very broad request which is just documents showing the

22   cost of goods for the accused devices.

23         MR. DACUS:  Yes, your Honor.

24         THE COURT:  I mean, obviously that's going to

12:07PM  25   call for a lot of judgment as to what responds.  I mean,

94

1  I don't think you're asking for every document that

2  relates to something they purchase in the manufacturing

3  process.

4         MR. DACUS:  Not at all.

12:07PM  5         THE COURT:  So, why isn't this spreadsheet a

6  reasonable response to that request?

7         MR. DACUS:  Because, your Honor -- let's just

8  take the "cost of goods sold" category.  In sort of

9  accounting parlance and common terms, that is what's the

12:07PM 10  material and labor that went into this product, right,

11  for just -- speaking in lay language.  Our understanding

12  is -- and certainly LG can represent if it's otherwise --

13  this is not necessarily the actual cost of material and

14  labor that went into the product.  This is, in contrast,

12:08PM 15  a transfer price, meaning a price that LG Korea charged

16  to the LGEMU entity.  We believe we're entitled to know

17  the true cost of goods sold, that meaning the actual

18  expenditure either by the Korean entity or another LG

19  affiliate.

12:08PM 20         THE COURT:  Well, I think that what they've

21  produced here is a reasonable response to a very broad

22  request; and if you have a more specific request, then I

23  think it's incumbent on you to communicate that and give

24  them an opportunity to respond.

12:08PM 25         MR. DACUS:  Understood, your Honor.

95

1      THE COURT:  I don't think that it would be

2  appropriate for me to simply say "produce all documents"

3  on a category that broad; and, so, I guess, Mr. Dacus,

4  I'm in a position where I don't think I'm able to grant

12:09PM  5  you the relief that you're after.

6      MR. DACUS:  Your Honor, could I potentially

7  modify the request -- I think what I'm about to suggest

8  is subsumed within the request -- that they identify not

9  all documents but, rather, as they have done in this

12:09PM  10  spreadsheet, the actual cost of goods sold for each

11  product that they've identified in the spreadsheet that

12  they've shown to the court, rather than the cost of goods

13  sold element based on a transfer price?

14      THE COURT:  And what would that document be?

12:09PM  15  For instance, these are different models, I guess, of

16  these phones.  What document would they have that would

17  show what you're calling the "actual cost of goods sold"

18  for a particular model?

19      MR. DACUS:  I cannot identify the document by

12:09PM  20  name, your Honor; but I'm confident that they have that

21  type of document.  In fact, if they gave us the

22  spreadsheet that they've shown to the court today and

23  just inserted in the "cost of goods sold" column the

24  actual cost of goods sold rather than cost based on the

12:10PM  25  transfer price, that would be adequate to satisfy what we

1  need.

2           THE COURT:  Can you identify for me what you

3  have received from other manufacturing defendants on this

4  issue?

12:10PM  5           MR. DACUS:  I think it's come in in differing

6  forms, your Honor.  There are certainly manufacturers who

7  keep it in this fashion, where they track their costs by

8  model; and they've provided a spreadsheet in that regard.

9  I think there are others who, you know, don't necessarily

12:10PM  10  keep it in a spreadsheet or *Excel* format like this but

11  just track it on a product-by-product basis individually

12  and then provided it on a product-by-product basis.

13  Maybe I'm not doing a good job of explaining, but it

14  certainly -- it would be beyond incredulous if someone

12:11PM  15  within the LG family, be it Korea or otherwise, did not

16  track the amount of costs that go into making one of

17  these products or phones.

18           THE COURT:  Well, do you have any evidence

19  that the number they've given you is not the actual cost

12:11PM  20  of goods sold?

21           MR. DACUS:  The evidence that I have is what

22  they've told us all along, is that they do not have

23  access to information from LG Korea.  I know they've said

24  things a little differently today and as of Monday.

12:11PM  25           THE COURT:  Well, has anybody said that what

97

1   is shown on this spreadsheet is just the transfer cost?

2           MR. DACUS:  Not that I'm aware of, your Honor.

3   Mr. Nafei is the corporate representative who spoke on

4   this; and he was unable to answer that question, is my

12:12PM   5   recollection.  I don't have his deposition testimony in

6   front of me, but I don't remember that he was able to

7   answer that specific question as to whether it was an

8   actual cost or a transfer cost.

9           THE COURT:  All right.

12:12PM   10           MR. DACUS:  He did generally say in that

11   deposition that that type of information was maintained

12   by the LG Korea entity, the type of financial information

13   that we sought.

14           THE COURT:  Well, I'm sure that he would say

12:12PM   15   that the backup for all of these numbers resides with LG

16   Korea.

17           MR. DACUS:  Correct.

18           THE COURT:  But I don't think that that

19   necessarily means that these are transfer costs and not

12:12PM   20   actual costs.

21           MR. DACUS:  I cannot argue with you on that

22   point, your Honor.

23           THE COURT:  Okay.

24           MR. DACUS:  Other than what we've generally,

12:12PM   25   you know, been told throughout the course of the case,

1   that LGEMU is a separate entity, "We don't have access to

2   the LG Korea information."  And I think the logical

3   deduction from that is there's certainly a transfer price

4   from the Korean entity to the U.S. entity.

12:13PM   5   THE COURT:  Now, all of this really relates,

6   in terms of your interest in it, to what your damages

7   expert would figure out in trying to apportion a

8   reasonable royalty to the -- your patented

9   functionalities, right?

12:13PM   10   MR. DACUS:  With respect to this issue, that's

11   correct, your Honor.

12   THE COURT:  I certainly think that your expert

13   can work with this information to come up with an

14   opinion, and I -- not having any further indication that

12:13PM   15   what you have been provided is not what it purports to

16   be, being the cost of goods sold, I'm not going to grant

17   any further relief on that.

18   MR. DACUS:  Understood, your Honor.  Thank

19   you.

12:14PM   20   THE COURT:  All right.  I want to, over the

21   break --

22   MR. LEVY:  Your Honor?

23   THE COURT:  Yes.

24   MR. LEVY:  If I may, just one very small

12:14PM   25   point.

99

1           THE COURT:  All right, Mr. Levy.

2           MR. LEVY:  Referring to these as transfer

3     prices -- we just took a quick look at the deposition

4     transcript where Dr. Nafei was questioned about this, and

12:14PM  5     he pretty expressly says that this isn't the transfer

6     price.  He's asked where is the transfer price on here.

7     He says it's not on here.  These are the costs.

8           THE COURT:  Okay.

9           MR. GARDNER:  Your Honor, can I say one thing,

12:14PM  10    too, for the record?

11          THE COURT:  All right.

12          MR. GARDNER:  I am familiar with this court's

13    practice.  This is the very first time that we have heard

14    this issue today, and the reason -- that's the reason

12:14PM  15    it's not in my slide show.  We produced this like months

16    ago.  They -- not once did they say, "Wait a second, you

17    know" -- and bless our heart, Mr. Dacus is a good lawyer;

18    but he is trying to save the -- I don't know, judge --

19    trying to get some victory out of the jaws of defeat.

12:15PM  20          The fact of the matter is that they have had

21    this; and if they had ever said anything -- they have,

22    respectfully, sat on their hands; and today they are

23    trying to salvage something to get you to order something

24    of an entity that's not in this case.

12:15PM  25          We have complied with our obligations.  We've

1 done what we had to do.  We gave them the information

2 they requested.  I was in a hearing three weeks ago, and

3 I'm trying to -- I struggle with what it was.  But

4 clearly if the plaintiff knows they have something, they

12:15PM 5 have a duty to say, "Hey, wait a second.  I need more" or

6 "I don't have this" or "I've got to go to third parties

7 for discovery."  They've got an onus.  They can't put it

8 all on me.

9           THE COURT:  All right.

12:15PM 10          MR. GARDNER:  Yes, sir.  Thank you.  Forgive

11 me.

12           THE COURT:  Thank you, Mr. Gardner.

13           What I'm going to do is ask counsel during the

14 lunch break to -- in addition to eating, to confer about

12:16PM 15 the calendar and at least come up with positions; and

16 after lunch I want to hear from both sides what your

17 positions are about what the court should do with the

18 DCO.

19           I've indicated to you that I'm going to extend

12:16PM 20 the trial for whatever time is minimally necessary for

21 the plaintiff to get another expert; and if, you know,

22 either side wants to -- you know, if you can reach an

23 agreement on that, great.  If not, I at least want to

24 know what the positions of the parties are.

12:16PM 25          MR. GARDNER:  Please forgive me, sir.  Excuse

1  me for standing up.  But is the court going to deny the

2  motion?  Because that would help us in understanding what

3  we -- I'm not trying to get a ruling.  I'm just -- I want

4  to make sure we understand what we're negotiating about.

12:16PM  5      THE COURT:  My tendency at this point is to

6  say yes I'm going to deny the motion, but I want to think

7  further about it and look at it over the break.  But I

8  would say that's certainly where I am leaning at this

9  point.

12:17PM  10      MR. GARDNER:  Thank you, your Honor.  I'm

11  sorry for standing up so much and for talking so fast.

12      THE COURT:  All right.  So, we'll come back

13  and take up the rest after lunch.  We'll be back at 1:15.

14  Thank you.

12:17PM  15      (Recess, 12:17 p.m. to 1:37 p.m.)

16      (OPEN COURT, ALL PARTIES PRESENT.)

17      THE COURT:  I understand that counsel have

18  reached some agreements during the recess.

19      Mr. Dacus?

01:37PM  20      MR. DACUS:  We have, your Honor, at least some

21  to propose to the court for the court's consideration.

22      THE COURT:  Okay.

23      MR. DACUS:  What we propose as far as the

24  schedule going forward, given the court's ruling in

01:37PM  25  striking Dr. Bims, is that MTel would submit a new name

1  of an expert within 30 days from today; and then LG would

2  have 7 days to object to that expert -- object or not

3  object, I guess.  45 days from that day, assuming LG

4  agrees to the expert, we -- MTel would submit its

01:38PM   5  infringement report from the new expert.

6           In addition, your Honor, we would need to

7  submit a supplemental damages report for the purpose of

8  our damages expert -- there are references in his report

9  to Dr. Bims and his reliance on Dr. Bims; so, he would

01:38PM  10  now need to say that he is relying on the new expert,

11  whatever conversations he had with him.

12           THE COURT:  Would that occur within that same

13  45 days?

14           MR. DACUS:  It would, your Honor, yes.

01:38PM  15           And then 30 days from submission of MTel's

16  expert report, LG would submit its rebuttal report.  And

17  I presume that could be on both infringement and damages

18  if they -- there may not be a need for a damages report,

19  but to the extent there is.

01:39PM  20           MR. LEVY:  I'm sorry, your Honor.  May I just

21  clarify?  I was taking notes.

22           How many days did you just say?

23           THE COURT:  30 is what he said, after their

24  report, for your rebuttal report.

01:39PM  25           MR. LEVY:  Thank you, your Honor.

1          THE COURT:  All right.

2          MR. DACUS:  And then our final proposal, your

3   Honor, is that we would have a trial date in February,

4   subject to the court's schedule.  If we could get on the

5   February --

6          THE COURT:  The February jury selection date

7   for Judge Gilstrap is the 8th, February the 8th.

8          MR. DACUS:  We don't have any objection to

9   that.

10          THE COURT:  Okay.

11          MR. DACUS:  And I believe that's the entirety

12   of our proposal.  We would need to work out some interim

13   dates for pretrial disclosures and those kinds of things,

14   the standard sorts of things that go along.  I'm

15   confident we can do that.  If the court gives us a

16   February 8th trial date, we can submit a more

17   comprehensive docket control order that includes all the

18   interim dates, if that's agreeable with the court.

19          THE COURT:  All right.

20          MR. DACUS:  And then one other thing to add is

21   with respect to the pretrial dates that are currently

22   pending and occurring even as we sit here, we would ask

23   that the court stay those pretrial deadlines because we

24   think it would be unnecessary and inefficient to complete

25   those at this point in time.

1　　　　　THE COURT:  All right.  I would be willing to

2　stay them for a period of -- I don't know -- seven days,

3　whatever, for the parties to submit a new proposed DCO.

4　　　　　MR. DACUS:  Yes, sir, we'd be happy to.

01:40PM　5　　　　　THE COURT:  Is that enough time?

6　　　　　MR. DACUS:  Yes, sir.

7　　　　　THE COURT:  You can also, if you want, call

8　Ms. Andrews and she can give you a pretrial conference

9　date to fit into that proposed DCO you're talking about.

01:41PM　10　　　　　MR. DACUS:  We will do that, your Honor.

11　　　　　THE COURT:  We'll go with the February 8 jury

12　selection before Judge Gilstrap.

13　　　　　All right.  Have there been any agreements on

14　the other motions that are pending?

01:41PM　15　　　　　MR. DACUS:  The other motion that I am aware

16　of that's pending is the Motion to Strike the

17　supplemental report.

18　　　　　THE COURT:  Uh-huh.

19　　　　　MR. DACUS:  And I'll do my best to describe it

01:41PM　20　and ask for LG's help.  The supplemental report

21　essentially contains opinions related to the '946 patent

22　and the '506 patent.  My understanding is that we have

23　agreement that LG will not -- or will withdraw its motion

24　to the extent it relates to the '946 patent but maintains

01:42PM　25　its motion with respect to the '506 patent.

1                THE COURT:  Okay.

2                MR. DACUS:  From MTel's perspective with

3    respect to that, we need to and plan to consult with our

4    client as to whether or not we will continue to assert

01:42PM  5    the '506 patent, given some of the court's rulings today;

6    and it may -- obviously if we're not going to continue

7    prosecuting the '506 patent, that will moot the remainder

8    of that motion.  And if we don't withdraw it, then I

9    presume LG would want to continue to prosecute that

01:42PM  10   motion.  So, what we would ask the court to do today is

11   just pass on that motion.

12                THE COURT:  For how long?  I guess what I want

13   is a date by which you will indicate your client's

14   decision on that.

01:43PM  15               MR. DACUS:  Understood, your Honor.  14 days.

16                THE COURT:  And I promise to give the

17   defendant a chance to be heard on this entire scheme.

18                Okay.  Any other component of this agreement,

19   Mr. Dacus, from your side?

01:43PM  20               MR. DACUS:  None that I am aware of, your

21   Honor.  Thank you very much.

22                THE COURT:  Okay.  Mr. Gardner.

23                MR. GARDNER:  Yes, sir.  Your Honor, Allen

24   Gardner for Defendant LG.  And I'll defer to my folks if

01:43PM  25   I misstate something.

106

1    I do want to make it abundantly clear.  One,

2  we had made this agreement assuming the court has denied

3  the Motion to Compel.

4    THE COURT:  And I do intend to do that.

01:44PM  5    MR. GARDNER:  Secondly, sir, I want to make --

6  we've had a bunch of talks over the lunch hour.  This

7  agreement to allow the substitute infringement expert

8  does not change the underlying scope or theories in the

9  case.

01:44PM  10    THE COURT:  Well, and let me just help you on

11  one regard.  It's not by agreement that the substituted

12  expert is coming in.  I am --

13    MR. GARDNER:  Yes, sir.

14    THE COURT:  -- allowing them.  So, you don't

01:44PM  15  have to take that bullet for your client.  That's coming

16  from me.

17    MR. GARDNER:  Appreciate it, sir.  I don't

18  want any bullets for my client.  I get enough of those

19  already.

01:44PM  20    Yes, sir.  Subject to the court's ruling,

21  we -- what my fear is -- I'll put this on the record -- I

22  don't want to be six months from now with an infringement

23  expert who changes dramatically the scope or theories of

24  the case because then it totally changes everything.  I

01:45PM  25  mean, this deal that we're talking about in terms of

01:45PM

01:45PM

01:45PM

01:46PM

01:46PM

 1  trial date operates on the assumption that the case --

 2  the scope and theories of the case remain the same.

 3          And concerning the damages expert, you know,

 4  what we've talked about, my envisioning of any new

 5  damages expert report would essentially substitute out

 6  Dr. Bims for new person's name.  Obviously they need to

 7  consult with that person.  I just -- I do not want to see

 8  a massive or even a minor theory or scope change in this

 9  case or else, respectfully, we'll be right back here six

10  months from now having another big discussion.  So, I

11  think we've talked extensively about that.  I want to

12  make sure that that's agreeable with them as well.

13          Also, as to the '506 patent issue, I think our

14  agreement is if they drop the '506 patent, we will not

15  continue to challenge the supplemental report on the

16  basis of timeliness or whatever as to the '946 patent.

17  Obviously substantively we disagree with it; but assuming

18  they drop the '506 patent, we're not --

19          THE COURT:  Okay.

20          MR. GARDNER:  Mr. Beaber, if you want to

21  clarify.

22          MR. BEABER:  I would just add they don't have

23  a current damages report on any patent other than the

24  '946.  So, we've asked opposing counsel to confirm that

25  they would drop those two patents as a result of your

01:46PM

1 Honor's ruling on the Motion to Compel. I understand
2 that they can't give us a response on that today because
3 they have to consult with their client. So, what we
4 proposed was to delay any ruling on the Motion to Strike
5 until they get a response from their client which will
6 hopefully moot anything dealing with that patent, because
7 we would agree to the scope of the '946 supplementation
8 if that were the case.

9 THE COURT: Okay. Thank you.

01:46PM

10 MR. GARDNER: Your Honor, I'd just ask
11 Mr. Dacus to confirm at least my scope and theory
12 viewpoint. I think it's agreeable. I just want to make
13 sure we're all in agreement on that.

14 THE COURT: And, Mr. Dacus, I certainly expect

01:47PM

15 that the scope of the new infringement expert report will
16 not change. That's a broad definition and I guess we'll
17 just have to see, but that -- certainly I'm going to
18 operate from that premise, that it's not going to enlarge
19 the scope of the case.

01:47PM

20 MR. DACUS: Understood, your Honor.

21 THE COURT: And do you agree also with the
22 understanding that the defendant's withdrawal of their
23 Motion to Strike on the '946 is contingent upon your
24 client's decision to drop the '506?

01:47PM

25 MR. DACUS: I understand that now, your Honor.

1    THE COURT:  Okay.  Then that -- all right.

2 Well, I'll try to reflect these outcomes in the order;

3 and I'll expect that within the next seven days we'll get

4 a proposed DCO for a February 8 trial date.

01:48PM    5    Anything else we need to take up on your

6 motions, Mr. Gardner?

7    MR. GARDNER:  No, sir.  Thank you so much for

8 your time; and thank you for working with us on

9 scheduling, sir.

01:48PM   10    THE COURT:  Okay.  Mr. Dacus?

11    MR. DACUS:  Nothing from the plaintiff, your

12 Honor.

13    THE COURT:  All right.  Thank you.  We're

14 adjourned.

01:48PM   15    (Proceedings adjourned, 1:48 p.m.)

16

17

18 COURT REPORTER'S CERTIFICATION

19    I HEREBY CERTIFY THAT ON THIS DATE, JULY 28,

20 2013, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

21 RECORD OF PROCEEDINGS.

22

23

24    /s/ _____
         TONYA JACKSON, RPR-CRR

25